UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
UNITED STATES OF AMERICA
                                            :
        - v. -                              :          07 Cr. 1071 (PKC)
                                            :
MICHAEL HERSHKOWITZ,
                                            :
            Defendant.
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America


HARRY A. CHERNOFF
Assistant United States Attorney,
    Of Counsel.

# TABLE OF CONTENTS

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SENTENCING ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I      Loss Amount. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          A.     Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          B.     The Measure of Actual Loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II     The Remaining 3553(a) Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          A.     The Defendant's Financial Benefit . . . . . . . . . . . . . . . . . . . . . . . . . 11

          B.     Good Works and Post-Offense Rehabilitation . . . . . . . . . . . . . . . . . . 12

          C.     Deterrence and Similarly-Situated Defendants. . . . . . . . . . . . . . . . . . 14

          D.     A Departure To Encourage Restitution. . . . . . . . . . . . . . . . . . . . . . . 15

    III.   Substantial Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    IV.   Victim Impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    V.    Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    VI.   Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                            :

UNITED STATES OF AMERICA

                            :

       - v. -                        07 Cr. 1071 (PKC)

                            :

MICHAEL HERSHKOWITZ,

                            :

          Defendant.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM

Defendant Michael Hershkowitz is scheduled to be sentenced on January 28, 2010. The Government respectfully submits this memorandum in response to the defendant's sentencing memorandum ("Def. Mem.") and in opposition to the downward departures he requests.

Additionally, this memorandum serves to advise the Court of the pertinent facts concerning the assistance that defendant has rendered pursuant to his cooperation agreement with the Government concerning the charges contained in the indictment. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the United States Sentencing Guidelines ("U.S.S.G.").

FACTUAL BACKGROUND

As set forth in the Presentence Report ("PSR"), the defendant and his partner, Ivy Woolf Turk, owned and managed a Manhattan real estate development company, the Kingsland Group, Inc., and several related entities (collectively, "KG"). From 2003 through 2007, the defendant and his partner raised money from approximately 70 individuals who, in total, lent approximately $27 million to KG principally for the renovation of several multi-family apartment buildings in upper Manhattan. (PSR ¶ 8). Offering above-market interest rates, the defendant and his partner represented to the victims that they would hold recorded, first mortgages in the properties; but the mortgages were intentionally not recorded. (PSR ¶ 8). Instead, the defendant and his partner borrowed another $51 million from institutional investors and recorded *those* mortgages, thereby subordinating the individual victims' unrecorded mortgages. (PSR ¶ 9).[1] The defendant and his partner provided the victims with false documents, including false title insurance policies (PSR ¶ 34), to suggest that the mortgages had in fact been recorded. (PSR ¶¶ 10, 11).

In April 2005, KG failed to repay one of the loans that had come due. (PSR ¶ 12). Several million dollars of defaults followed (PSR ¶ 12), but the victims were in many cases convinced to roll over their investments. Some, however, feeling understandable anxiety about their investments, raised questions about whether the mortgages had been recorded. (PSR ¶ 13). At that point, to conceal further the fraud, Woolf Turk and Hershkowitz forged fake recording

---

[1] In his sentencing submission, the defendant appears to attempt to explain his conduct by placing in it the context of a transaction in which additional capital was required to complete the deal and avoid losing a $1 million deposit. (Def. Mem. at 26 n.1). Of course, the defendant was not under any kind of cognizable duress, and the context he provides in no way justifies or ameliorates his conduct: the individual investors could have been informed that the situation required resort to institutional lenders, but they were not.

sheets, including the official seal of the City of New York, and provided them to the victims. (PSR ¶ 13). In January 2007, Woolf Turk wrote to one of the victims that "our mortgages with your group are in first position" and then mailed the phony recording sheets to the victim. (PSR ¶¶ 28, 29). The victim, however, accessed the on-line City records, and found that the mortgage recording sheets available there did not match those she had been provided by Woolf Turk.

In May 2007, the individual victims filed a lawsuit in New York State Supreme Court and learned to their collective shock that while their $27 million in loans had not been recorded, those loans made by institutional lenders had. Settlement negotiations failed when the victims determined that KG could not or would not provide them with a substantial recovery. In July 2007, the fraud was reported to the FBI, and KG was put into bankruptcy proceedings.

Two years later, KG's assets have been liquidated, the institutional investors have been paid their $51 million in loans, and, as is now clear, the individual investors have lost their entire investments, approximately $27,184,750. (PSR ¶ 39).

## SENTENCING ISSUES

Because the defendant entered into a standard cooperation agreement with the U.S. Attorney's Office, there is no stipulation between the parties as to the Guidelines calculations, and the parties are free to make all available sentencing arguments. The Government will not address all of the arguments advanced by the defendant, but, for the reasons sets forth below, the Government submits that the Guidelines range calculated by the Probation Department of 121 to 151 months is the correct Guidelines range (prior to credit for cooperation).

I.    Loss Amount and the Seriousness of the Offense

As the Court is aware, Hershkowitz's sentencing follows on the heels of the sentencing of

Woolf Turk, who, facing the same sentencing range as Hershkowitz, made a variety of sentencing arguments in support of her contention that the loss amount for Sentencing Guidelines purposes is zero, and a sentence of probation would be appropriate. *See* Sentencing Memorandum of Ivy Woolf Turk. (Def. Mem. Ex. I). Her Guidelines analysis was also advanced in an *amici curiae* brief filed by the National Association of Criminal Defense Lawyers, the New York State Association of Criminal Defense Lawyers, and the New York Council of Defense Lawyers. (Def. Mem. Ex. J). The Honorable Naomi Reice Buchwald rejected the Guidelines arguments of the defendant and the *amici curiae* and determined that the correct offense level was 32, yielding a Guidelines sentencing range of 121 to 151 months. Based on a variety of the defendant's personal characteristics, Judge Buchwald then sentenced Woolf Turk to a non-Guidelines sentence of sixty months. ( The transcript of Woolf Turk's sentencing is Exhibit M of the Defense Memorandum.)

Hershkowitz does not advance the same sentencing arguments are starkly as his co-conspirator did; instead, he explains that he has "previously argued to the government" these same positions (Def. Mem. at 36, 38). Hershkowitz also acknowledges that "the argument that the loss amount in this case should be reduced due to the many 'external' and 'unforeseeable' factors that intervened . . . may not rise to the level required by the Second Circuit's jurisprudence on loss causation." (Def. Mem. at 56). Regardless of the force with which Hershkowitz presents these arguments, however (and some are presented only in the form of attaching to his memorandum those of Woolf Turk and the *amici*), they should be entirely rejected.

The defendant's sentencing position with respect to loss, to the extent it echoes Woolf

Turk and the *amici,* is based on several flawed assumptions. First, the defendant treats the amount lent by the victims as equivalent to equity investments in the stock market, and thereby seeks to import the logic of cases that considered loss amount in that inapposite context. Second, the defendant discounts the value of the properties lost to the costs of bankruptcy proceedings and the attendant decline in the real estate market during that time, rather than acknowledging that these costs were the inevitable result of the defendant's criminal conduct. Third, the defendant implicitly blames the victims for not following his urging to sell the buildings to a hedge fund in a transaction that he contends would have made everyone whole. In fact, the hedge fund deal could not have closed the way the defendant portrays it, and therefore it offered no solution at all to the catastrophic losses that the defendant visited upon his victims.

A.      Applicable Law

"[L]oss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* 3(A)(i). "'Reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* 3(A)(iv). Loss shall be reduced, "[i]n a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." *Id.* 3(E)(iii).

The defendant contends that much of the loss because it was caused by external market factors, rather than his fraud. To advance this argument, he relies on authority which considered sentences for securities fraud and imported loss-causation concepts from the context of civil

securities fraud suits. *See United States* v. *Rutkoske*, 506 F.3d 170, 179-80 (2d Cir. 2007) ("For example, a fraud disclosed just as the dot-com bubble burst might cause most, but not necessarily all, of the decline in previously high-flying technology stocks.") (Def. Mem. at 54). These concepts should not be extended to measure the losses of victims who, unlike securities investors, were not making an equity investment. To state the obvious, a shareholder investing in stock or other equities is embracing a degree of risk in exchange for enjoying dividends and increased share prices when the company in question is profitable. He is also aware that both market forces and the acts of management can affect his investment, perhaps dramatically.

In contrast, the victims here believed they were making a very safe investment by lending money at a fixed rate through recorded mortgages. They had no possibility of upside beyond the interest payments they were contractually promised; they had no inkling that they could suffer the kind of downside that they have suffered. This is not a case of fraud in an accounting statement driving down a share price; rather, the property that was pledged as collateral for the victims' money, in their case, effectively did not exist. It was only because the defendant and her co-conspirator chose to defraud the relatively unsophisticated individual victims that the defendant could make that same collateral available to other lenders whose mortgages were recorded.

Moreover, in classic, Ponzi-scheme fashion, the influx of capital that the fraud made possible -- the second set of recorded mortgages held by banks -- enabled the defendant to pay the individual victims an above-market interest rate to entice them into the scheme, and then to convince them to roll over their investments into further mortgages once their mortgages had come due. This continued a pattern of paying victims interest payments to obscure the fact that the principal loan amounts had been misused. It is therefore unclear to the Government why the

-6-

defendant makes mention that "[p]ayments of substantial interest to investors were made for years, without fail, prior to the discovery of the fraudulent conduct." (Def. Mem. at 28).

Even under the precedent that the defendant cites, the essential question here is whether the Court can "accurately assess what [the victims'] conduct would have been had they known the truth." *United States* v. *Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006). Here, the answer is clear: had they been told that their mortgages would be subordinate to the over $50 million in mortgages taken out from institutional lenders, the victims would not have lent their hard-earned savings and their retirement funds to the defendant.

B.     The Measure of Actual Loss

There can be no dispute that the individual victims actually lost over $20 million after the available assets had been sold and the proceeds were distributed first to the institutional lenders whose mortgages had been recorded. The question raised by the defendant is whether the collateral was somehow squandered and otherwise diminished in the time that it took to dispose of it.

No theory of valuation proposed by the defendant should overturn the settled principle that the Court should look to the actual losses are measured by the value of the collateral at the time of its actual disposal.[2] As set forth below, none of the defendant's contentions provides a basis to apply a different analysis.

1.     The Hedge Fund Deal

The defendant contends that the hedge Och-Ziff ("OZ") was prepared to close a deal to

---

[2] The essential question posed by the defendant is whether the victims' losses were increased by factors beyond his control after the discovery of the fraud in May 2007. The defendant's recounting of the civil litigation, the *lis pendens*, and related matters is irrelevant.

purchase the Uptown Portfolio of buildings (Def. Mem. at 31), and that the price that OZ may have been prepared to pay represents a relevant valuation of the portfolio (Def. Mem. at 37 & n.14). However, there were enough significant barriers to the OZ deal that it was entirely reasonable for the victims to conclude that the OZ deal would fall apart and could not properly be relied upon to make them whole. While the Government is not of course privy to all of the details of the negotiations among KG, OZ, and eventually, the fraud victims and others who would become parties in the bankruptcy proceedings, the Government has interviewed victims and their counsel in the course of the prosecution who were uniformly of the view that there were far too many uncertainties for the victims to opt against availing themselves of the mechanism of involuntary bankruptcy. (Def. Mem. 7).

For instance, of the sixteen properties in which victims had invested, KG had sold 50% interests in ten of them to other parties. Six of the properties were 50%-controlled by French investors (the so-called "BH Investors"), who had not agreed to the OZ deal. Counsel for the BH investors advised the victims that the BH investors would not consent to a sale of the properties to OZ or anyone else in which proceed were used to repay the mortgage fraud victims ahead of the French investors (who ultimately lost their entire $6 million investment as well). Another three properties were jointly owned by the Beerman Family Trusts, who had acquired their share of the buildings through a tax-driven transaction known as a Section 1031 "like-kind exchange." The Beerman family was never consulted about the OZ deal, and would not have consented to it because, with respect to the disposition of their properties, the deal did not meet the requirements of Section 1031 of the Internal Revenue Code and would have resulted in massive tax liability.

It is unclear from anything that the defense has submitted whether the hedge fund's due

-8-

diligence had uncovered all of these significant barriers to closing the deal in a way that could have benefitted the victims -- and that would have lowered the price OZ was willing to pay. But given that the Bankruptcy Trustee had to employ forensic accountants to spend months unraveling all of the competing claims against KG -- including many that are outside the scope of the fraud charged in this case -- it is not surprising that the victims chose not to rely on the defendant's representations that he could rescue their funds if they trusted him once again.

        2.    <u>The Rent Roll Valuation</u>

The defendant alternatively contends that the value of the properties can be ascertained from the rent rolls (Def. Mem. at 37 & n.15), a proposition which is not itself controversial. Given that the defendant is implicitly alleging that the professionals working for the Bankruptcy Trustee somehow failed to secure a purchaser who was willing to pay the price suggested by the rent roll, however, the natural question is what is the appropriate multiple of the rent roll. The defense contends, without adequate support or expert testimony, that "during the relevant period, that multiple ranged from twelve to fourteen times the annual rent roll." (Def. Mem. at 37 n. 15). Of course, the defense's "relevant period" would be the high point of the enormous, recent real estate bubble. Once the real estate bubble deflated, as it did soon after this article was published, the high multiple which the defendant proposes was no longer an appropriate measure of price.

        3.    <u>The  Recession and Decline in the Real Estate Market</u>

The defendant also contends that the loss amount was exacerbated by extrinsic economic factors, although he concedes that these factors "may not rise to the level required by the law to break the causal link between Mr. Hershkowitz's conduct and the individual investors' loss." (Def. Mem. at 38).

At the time that the fraud was uncovered, the defendant and his co-conspirator still believed that KG could grow its way out of the fraud, carried by the ever-expanding real estate bubble, and thus the defendant and his co-conspirator forged the documents that would permit the fraud to continue. Once that ruse was uncovered, they continued to hope that the growing real estate market would save them from responsibility for their fraud in the form of a hedge fund purchaser.

But the victims in this case, as stated previously, were not equity investors; they were lenders. The reason they were victimized by the defendant was that their mortgages were not recorded and therefore the debt was inferior to that owned by the institutional investors. It does not excuse that defendant's conduct that the real estate market did not continue its previously unabated growth such that the defendant's crimes would be masked. It goes without saying that fraud victims are more harmed in contracting economies.

Moreover, even if the Court were to consider the drop in the real estate market during the pendency of the Bankruptcy Trustee's efforts to sell the buildings, this analysis would in no way result in a loss of zero. Instead, the Court should consider what the victims would have received as a result of the sale of the buildings *but for the fraud*. Zev Cohen, the chairman of the Kingsland Unsecured Creditor's Committee, provided this analysis in a letter to Judge Buchwald, submitted in connection with Woolf Turks' sentencing. As he explained, in the depressed real estate market, the properties in question were sold for approximately $67.4 million. Had the $27 million in unsecured creditors' loans been recorded just as the $55 million provided by the institutional lenders were, the individual victims would have received approximately 82% of the money back. Instead, a substantial portion of the $12 million that remained after the $55 million

was paid out went to bank default interest payments and legal fees. Accordingly, had the individuals victims' mortgages been recorded, they would have received approximately $22 million, with the banks bearing some of the loss that may have been attributable to market decline, rather than it being shouldered by the individual victims alone. In short, the defendant's fraudulent conduct resulted in $22 million in loss to the fraud victims. While the Government submits that the Court should find that the loss amount is $27 million, the loss caused by the fraud cannot be deemed less than $22 million even if the shortfall in the sales prices is discounted.

This difference in loss amount does not alter the Guidelines offense level.

II.     The Remaining 3553(a) Factors

The Government will here comment only briefly on some of the 3553(a) factors that Hershkowitz advances in support of a non-Guidelines sentence.

A. The Defendant's Financial Benefit

Although the victims' funds were, as the defendant points out, largely spent on the business of purchasing and rehabilitating apartment buildings, it seems obvious that the defendant's reported income in recent years (PSR ¶ 102) could not possibly have supported the lifestyle that he provided as the sole breadwinner for his family of five.

In fact, the Bankruptcy Trustee hired a financial adviser and forensic accountant to analyze KG's books and records for, among other things, payments made by the company to or on behalf of the defendant, other than those identified as compensation. As set forth in an exhibit admitted into evidence at the Bankruptcy Court's hearing on the confirmation of the Chapter 11 liquidation plan, the Trustee's financial adviser determined that, from January 2001 through

September 2007, $6.6 million were disbursed in this fashion, including: $1.7 million in payments towards the defendant's condominium residence in Manhattan; $1.8 million in payments towards a second residence in Westhampton, Long Island; $1.4 million in payments towards a subsequent second residence in Atlantic Beach, Long Island; and various other expenditures on charitable contributions, medical expenses, and personal legal fees.[3] One of the victims, Budd Schwartz, describes in his attached letter the fraud particular to two of these properties:

> "One of the arguments in the [defendant's sentencing] memorandum was that the defendants did not personally benefit from the fraud. This may or may not have been true of Ivy, but it was not the case with Michael. We made three loans to a Marcy Simpson, represented to us as a successful Long Island real estate developer. We only discovered after the bankruptcy that she lived in a condo on Staten Island and was Michael's sister. I have little insight into the first loan. The second was to acquire two adjacent condo apartments on the Upper East Side and combine and upgrade them into a single 3,000 square foot residence. We found out after the bankruptcy that Michael with his family were living in the condo under a lease from his sister which included an option to buy, a scheme to mask his beneficial ownership. This loan was repaid, doubtless out of the funds raised from new investors in later 'mortgages.' The last Simpson loan was for the purpose of acquiring a large residence in Atlantic Beach, L.I., renovating it and adding a swimming pool. We later found that this was Michael's summer residence."

Letter of Budd Schwartz, January 19, 2010, at 2-3.[4]

B. Good Works and Post-Offense Rehabilitation

Hershkowitz requests that Court consider his years of charitable works and contributions

---

[3] The full document from the Bankruptcy Court filing, with its 50 pages of back-up, will be provided to the Court as a separate document in lieu of filing it with this memorandum.

[4] In contrast, the Bankruptcy Trustee found that payments from the company to or on behalf of Ivy Woolf-Turk, other than designated compensation, totaled $640,185.

to his house of worship. The Government agrees that these factors should be considered.

Nonetheless, it cannot be ignored that these arguments can be said to fall within "a pattern advanced by a subset of white collar criminal." *Regensberg*, 2009 WL 2163461, at *1. "Typically, these offenders appear at their sentencing well-represented and well-prepared, offering ample reasons why the Court should exercise exceptional discretion and show maximum leniency." *Id.* And, as here, the typical presentation

> comes to several conclusions it urges the Court to adopt: that the defendant has already shown full rehabilitation and earned redemption; that there is absolutely no likelihood of recidivism from this defendant and thus no threat of future harm to society; that no further need exists to punish the defendant because he has been wracked long enough by shame, by ruin of his family and personal life, by loss of his primary means to earn a livelihood. The purpose of sentencing thus having been satisfied, ergo: a sentence of any lengthy incarceration would serve little or no useful purpose.

*Id.* at 2. Judge Marrero in *Regensberg* went on to observe that these arguments omit consideration of the important sentencing factors of reflecting severity of the crime; promoting respect for the law; and avoiding unwarranted sentencing disparities. *Id.*

These observations ring just as true here. The defendant beseeches the Court to take account of the reduced circumstances and other suffering he has endured as a result of his arrest and conviction. But this conviction, the entirely probable outcome of years of risky, criminal behavior, must be contrasted with the suffering of victims who thought they were placing their hard-earned savings in safe, fixed-rate investments. Many of these victims, being significantly older than Hershkowitz, will not be able to take up new employment to replace the hole in their financial safety net left by the defendant's deceit. Hershkowitz's sentence must appropriately

-13-

reflect the severity of this crime and deter others from such fraud in the future.

Moreover, as some of the victims themselves have observed, the charitable contributions for which the defendant has been praised were made possible by the funds which he took from the victims. It is obviously galling for the victims who have suffered serious financial setbacks and in some instances been reduced to the direst of economic circumstances to witness the defendant being praised for his generosity with their money.

C.    Deterrence and Similarly-Situated Defendants

The defendant quotes an academic article in which the authors apparently muse that "'tougher sentencing might not be the deterrent [we] think' in light of [a] survey finding that 'executives are more fearful of wearing a scarlet letter than of doing hard time." (Def. Mem. at 77, quoting N. Craig Smith et al., *Do Stronger Laws Prevent Corporate Crime?*, 48 MIT Sloan Mgmt. Review 3, 6-7 (Spring 2007)). It is unclear whether the executives polled were less fearful of a lengthy prison term because they actually considered it a remoter possibility -- which might suggest that current sentences for white-collar crimes are inadequate deterrents, rather than overly punitive -- but, in any case, the notion that the shame of prosecution is sufficient to deter corporate crime is hardly persuasive. If the Department of Justice were in the practice of seeking scarlet letters instead of terms of imprisonment in its prosecutions, there would be very little criminal litigation in this District. The defendant's selection of various recent sentences for first-time financial offenders (Def. Mem. Ex M) is not sufficiently comprehensive, nor can a survey substitute for the individualized consideration of each defendant who comes before the Court for sentencing.

On the other hand, it is course relevant that the defendant's co-conspirator, Woolf-Turk,

received a below-Guidelines sentence of 60 months for the same offense conduct.

#### D. A Departure To Encourage Restitution

Hershkowitz contends that a shorter sentence will enable him to begin making restitution to his victims sooner. While a court is required to consider the need to provide restitution to victims in fashioning a sentence under 18 U.S.C. § 3553(a)(7), a defendant's ability to reimburse his victims for their losses does not make him less deserving of punishment than a defendant who cannot do so. Moreover, this is a poor reason for leniency here. Unfortunately, it is unlikely given the circumstances that Hershkowitz will ultimately succeed in finding employment that will allow him to make a meaningful dent in the enormous restitution he will owe. In the more than two years since his arrest, he has been largely unemployed. (PSR ¶ 86). Accordingly, this factor is no real basis for a reduced term of imprisonment.

### III. Substantial Assistance

The defendant merits a downward departure pursuant to Section 5K1.1 of the Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, principally because his cooperation with the Government was likely a factor in Ivy Woolf-Turk's decision to plead guilty, as set forth below.

The defendant decided to cooperate with the Government relatively early in this prosecution, and this came about in a somewhat unusual fashion. At the time of the simultaneous arrest of the defendant and Woolf Turk, Woolf Turk immediately indicated her desire to cooperate with the Government. Hershkowitz did not do so on the spot, but any initial hesitance is likely attributable to the fact that Hershkowitz had not yet retained criminal counsel (he was initially represented by the civil attorneys who were engaged in the related state court

action), whereas Woolf Turk, we believe, had separately consulted a criminal attorney in the days before her arrest. Moreover, at Hershkowitz's presentment, the Government (unsuccessfully) sought his detention, and so the defendant's focus over the next several days was understandably focused on satisfying the stringent bail conditions that were imposed on him, as he was detained pending their satisfaction.

In the meantime, Woolf Turk had begun to proffer with the Government. The Government was not, however, entirely satisfied with Woolf Turk's forthrightness: she admitted to participating in the fraud, but she portrayed it as something that Hershkowitz had executed without her knowledge, informing her after the victims first discovered that mortgages might not have been recorded.[5] She denied having participated in the forging of the mortgage recordations (as described in PSR ¶ 13), a claim which the Government did not have any concrete reason to doubt at the time, given that a search warrant executed at the company offices had led to the discovery of the forged documents in Hershkowitz's office.

Hershkowitz was aware that Woolf Turk was proffering with the Government at the time when he, through his newly-retained counsel, offered to proffer as well. He made this offer without any expectation of a cooperation agreement, but stated through counsel that he wished to do so because he intended to plead guilty regardless and he wished to be of any assistance that he could provide regardless of whether it resulted in a downward departure motion on his behalf. In fact, Hershkowitz was cautioned that it was unlikely he would receive a cooperation agreement, given that Woolf Turk was already on the road to receiving one. (At no point did the

---

[5] The defendant's memorandum indicates that Woolf Turk had informed the Government that she had learned of the fraud only two weeks before her arrest. (Def. Mem. at 39). This is inaccurate.

Government identify any additional targets of this investigation, and so the substantial assistance that either Hershkowitz or Woolf Turk could provide was principally one against the other.)

In several subsequent proffers of both defendants, however, Hershkowitz credibly convinced the Government that Woolf Turk had minimized her role in the conspiracy, and that she in fact had a substantially equal role for purposes of determining relatively culpability. In particular, Hershkowitz convinced the Government, through his own statements which were corroborated by electronic messages between himself and Woolf Turk around the time that the forged documents were created, that Woolf Turk had lied to the Government and that in fact she had herself created the forged documents -- although Hershkowitz did not shrink from admitting that he had an equal role in the forgery, but for his weaker skills with paper and ink.

In subsequent proffers, Woolf Turk was confronted with evidence that contradicted her prior proffer statements. She continued to deny his fuller role in the conspiracy, but not credibly. Accordingly, the Government terminated its discussions with Woolf Turk about potential cooperation. Moreover, although Hershkowitz had not expected to receive a cooperation agreement, the Government determined that, notwithstanding the likelihood that Woolf Turk would plead guilty in any case, Hershkowitz had earned a 5K motion. It should be added, of course, that Woolf Turk's guilty plea was by no means a certainty, particularly because her proffer statements were sufficiently ambiguous as to render them likely unusable at trial, and her decision to plead guilty was undoubtedly influenced to some extent by her clear understanding that Hershkowitz would testify against her at a trial. Moreover, Hershkowitz never attempted to blame anyone else affiliated with the company for the charged conduct, which helped satisfy the Government that its investigation had reached the appropriate conclusion in charging only the

two defendants.

Woolf Turk pled guilty without a plea agreement. Although her sentencing was vigorously litigated, she did not attempt to receive credit from the Court for her attempts to cooperate, nor did she challenge the Government's description of her role in the offense, based as it was in part on Hershkowitz's proffer statements. Judge Buchwald sentenced Woolf Turk, with a downward variance, to a term of 60 months.[6]

In addition to this substantial assistance, Hershkowitz also provided assistance to the Bankruptcy Trustee, which Hershkowitz describes in his sentencing memorandum. Hershkowitz participated in several proffer sessions with attorneys for the Trustee, as well as participating in more informal communications, typically through counsel, in an effort to assist the Trustee in identifying other potential claims that the Trustee might bring on behalf of the creditors. Hershkowitz also helped whenever asked with regard to questions about operation of the business which the Trustee was charged with operating following the filing of the involuntary bankruptcy petition.

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a

---

[6] The Government exercised its discretion not to prosecute Woolf Turk for false statements or other potentially applicable offenses, given her decision to plead guilty and not contest the fullness of her role in the offense conduct, nor did the Government seek an obstruction enhancement, given that FBI did not credit Woolf Turk's false statements, and therefore they did not obstruct or impede the investigation or prosecution of this offense, *see* Application Note 5(b), U.S.S.G. § 3C1.1. Therefore, by the terms of the proffer agreement, the Government did not disclose Woolf Turk's proffers and her apparently false statements Judge Buchwald, and the sixty-month sentence accordingly did not reflect Woolf Turk's misconduct in this regard.

defendant who has rendered substantial assistance. *See* U.S.S.G. § 5K1.1(a). The application of each of those factors to Hershkowitz's cooperation is set forth below.

1.    "[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1)).  As should be apparent, Hershkowitz's cooperation was significant and useful, in that it contributed to bringing the prosecution of Woolf Turk to a successful conclusion.

2.    "[T]ruthfulness, completeness, and reliability" of formation and testimony (§ 5K1.1(a)(2)).  The Government has never had any reason to doubt that the information provided by Hershkowitz was truthful, complete, and reliable.

3.    "[N]ature and extent" of assistance (§ 5K1.1(a)(3)).  Hershkowitz participated in numerous proffer sessions and was prepared to testify in any proceeding in which he was deemed necessary.

4.    "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§ 5K1.1(a)(4)).  The Government does not believe that the defendant or his family faced an tangible risk of injury as a result of his cooperation.

5.    "[T]imeliness" of assistance (§ 5K1.1(a)(5)).  As set forth above, Hershkowitz's cooperation came early in the prosecution, following his arrest but prior to the filing of an indictment.

IV.   Victim Impact

The impact of the approximately 70 victims is described eloquently in the several letters that the Court has received.. Pursuant to the Court's Individual Practices, letters that the Government has received concerning this sentencing are annexed to this memorandum.

V.   <u>Forfeiture</u>

The Government respectfully requests a forfeiture order in the amount of $ 27,184,750, an amount the forfeiture of which the defendant admitted in his plea agreement.

VI.   <u>Restitution</u>

The Government respectfully requests that the Court enter an order of restitution in the amount of $ 27,184,750, to be joint and several with the equal restitution order entered against Ivy Woolf Turk, 07 Cr. 1062 (NRB).  The Government will provide the Court will detailed information concerning apportionment among the victims of any restitution that may be paid.

<u>CONCLUSION</u>

For all of the foregoing reasons, the Court should calculate the offense level as 32, yielding a Guidelines sentence of 121 to 151 months, and should impose a sentence sufficient to reflect the seriousness of the offense and its impact on the victims, but which also credits the defendant with the substantial assistance he has provided the Government in the prosecution of another.

Dated:     New York, New York
           January 22, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Harry A. Chernoff
Assistant United States Attorney
(212) 637-2481

The following is a summary of payments (other than those identified as purported compensation)
made by The Kingsland Group, Inc. and KG Property Associates, Inc. to or on behalf of Michael Hershkowitz
January 1, 2001 through September 30, 2007

|  |  | $ |
|---|---|---|
| 1) | East ██th Street | 1,764,546.97 |
| 2) | ██████ Staten Island | 14,775.32 |
| 3) | ██████ Westhampton, NY | 1,863,110.44 |
| 4) | ██ Kings Ave | 1,482,849.18 |
|  | Accounting | 2,153.50 |
|  | Consulting Fees - Marcy Simpson (sister of Michael Hershkowitz) | 8,000.00 |
| 5) | Charitable and Other Contributions | 28,523.00 |
|  | Medical Expenses of Michael Hershkowitz and Family | 19,045.10 |
|  | Legal Fees | 31,500.00 |
| 6) | Payments of Other Personal Expenses Recorded to Michael Hershkowitz Loan Account | 1,387,242.48 |
|  | Transfer & Exchange | 36,451.00 |
|  | **Total Payments** | **6,638,196.99** |

Notes:

1) Condo titled in the name of Marcy Simpson and used as primary residence for Michael Hershkowitz and family.

2) Believed to be owned by Sandra Hershkowitz, Michael Hershkowitz's mother.

3) Beach house formerly titled in the name of Marcy Simpson and used by Michael Hershkowitz and family.

4) Beach house formerly titled in the name of ██ Kings Avenue Corp. (whose sole shareholder is listed as Marcy Simpson) and used by Michael Hershkowitz and family.

5) Additional charitable and other contribution payments in excess of $65,000 were paid to similar organizations, and therefore may also need to be added to this total.

6) Total payments reflected above in the Michael Hershkowitz loan account are net of two payments totaling $693,776.96 received by KG Property Associates, Inc., which reduce the total payments recorded to that account.

Prepared by Getzler Henrich & Associates LLC
August 4, 2008



Blumberg No. 5195

TRUSTEE
EXHIBIT
J

From:           Pat Robbins ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent:           Monday, January 11, 2010 10:46 PM
To:             Chernoff, Harry (USANYS)
Subject:        Re: Michael Hershkowitz Sentencing:  My Submission

January 11, 2010
Dear Mr. Chernoff,

I am writing to you so that you may file this letter in the public docket for the upcoming sentencing of Michael Hershkowitz.

My name is Patricia Robbins.  I am a 62 year-old widow.  I lost my life savings of a little over $200,000.00 because I trusted Michael Hershkowitz's integrity.  This dire reversal in my circumstances has caused me incredible pain.  I now have to live with my son and daughter-in-law because I can no longer afford my own place.  I can no longer afford to do the everyday things I used to take for granted, because I have to watch every penny I spend.  My life has changed completely, and I fight depression every single day.

I have not written before concerning this matter because it grieves me deeply to even talk about it, but I must speak up now.  It would be grossly unfair for Michael Hershkowitz to only receive Probation for what he has done.  He stole my life from me when he stole my money.  I do without things that I truly need because I simply can no longer afford them.  This has included things like doctor's visits, clothes and other necessities.

I met Michael Hershkowitz through Don Hass (now deceased), when Michael came to Ormond Beach, Florida, to tell potential investors about his wonderful investment opportunity.  He spoke to a large group of us, proclaiming the soundness of his company, Kingsland.  After hearing him, I had great confidence in his integrity which made his fraud all the more painful.

I bought what I was assured were legitimate titles to first-lien mortgages through his company, Kingsland.  I was paid interest on these mortgages I held for a little more than a year, then was informed that I had invested in a scam perpetrated by Michael Heshkowitz, and that I would no longer receive interest payments.  I had been able to live very comfortably on those interest payments, and was horrified when I learned of the scam.  I eventually discovered that not only would I no longer receive my interest payments, but that I had lost my entire savings.  Everything was gone!  My life, as I had known it had evaporated, and Mr. Hershkowitz and his lies were responsible.

Please consider the harm he has done.  His actions have been heartless and inexcusable.  He lied and he cheated me out of my life savings, and I have been devastated as a result.


Sincerely,


Pat Robbins
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

| | |
|---|---|
| **From:** | |
| **Sent:** | Sunday, January 17, 2010 2:01 PM |
| **To:** | Chernoff, Harry (USANYS) |
| **Subject:** | Victim Impact Statement |
| **Attachments:** | Lauras victim impact statement MH.wps |

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York NY 10007

January 17, 2010

RE: Michael Hershkowitz Sentencing

Your Honor,

First, I'd like to thank you for this opportunity to express my pain, emotional, mental, and even physical pain, as well as my frustration, outrage and downright anger.

Michael Hershkowitz stole $69,000 from me. This may not sound like a lot to some people, but it was money that I struggled to save. It wasn't easy to save that amount of money, but I put aside every penny I could for a long time until I finally had enough to invest. I invested in mortgages, and would reinvest until that money grew to $69,000. It was invested with Michael Hershkowitz and his Kingsland company and I used the interest payments to help cover living expenses each month. It was great not having to worry about how to pay health insurance premiums any longer. This $69,000, which I had planned to continue investing, was the all important principle that would provide a more secure future for my retirement while facing the declining economy.

Now, thanks to Michael Hershkowitz, I can no longer afford health insurance. I have no way to get decent health care despite having spinal cord and heart problems, both of which have been seriously exacerbated by stress, worry, and fear at having everything for which I worked so hard stolen by this amoral, deceitful man.

Michael Hershkowitz knowing, deliberately, cold bloodedly stole people's lives. He coordinated the intentional destruction of innocent people who he carefully had conned into believing him.

Your Honor, Mr. Hershkowitz talks about everything that's gone wrong for him since his arrest. He says he's embarrassed. Embarrassed! But notice it's only AFTER his arrest! He had not one single shred of remorse or conscience while he was committing his crime!

He claims he has suffered because he was belittled, ostracized and humiliated. But has he suffered because someone he trusted ripped his hard won life away? His victims have suffered because of him. His victims are still suffering because of him! So many people are suffering because of Michael Hershkowitz.

It's sad to see the suffering he has also caused to his own family, but it's sickening to see him now use their suffering as a way to gain leniency for himself. It just proves how selfish he continues to be.
This is a crime that he admits he continued for years, and one, when faced with discovery, he underhandedly scrambled to perpetuate. When one investor asked for a copy of a recorded

mortgage, Michael Hershkowitz wasn't embarrassed, or remorseful, or concerned for his investor. Rather he was frightened his crime would be discovered. Instead of showing any concern whatsoever for his investor, he discussed the best way to continue his criminal activity undetected.

Michael Hershkowitz claims to want a lenient sentence so he can find a way to pay back investors. In other words, he wants people to trust him again. The same way his investors trusted him. A man who wasn't the least bit concerned about his investors until he was publicly humiliated by his arrest. A man who's main theme seems to be to get himself the best possible deal from the court by talking about how he's suffered.
He's so selfish, it's mind boggling.

His crime has caused destruction for many people. Michael Hershkowitz also swindled and defrauded my mother, a senior citizen, of her total life savings! She's now suffering emotionally, mentally, and physically because of having her hard won way of life stolen from her.

Now that he can't work, and he can only stay at home, Michael Hershkowitz has dedicated himself to his family and is remorseful as 'deep regret pervades him'. All this comes AFTER he was caught! Where was his sadness and remorse while he was busy stealing peoples lives out from under them? Where was this deep regret as he cunningly plotted to keep that investor, or anyone else from discovering his crime?

In his letter he constantly talks about himself, his suffering, his goals, his needs, his hopes for himself. It only proves that he continues in his selfish thinking. Now he wants to say he's sorry, and have everyone trust him once more. He talks about his religion and his spirituality, but none of that bothered him during his crime. Only after he was caught.

Your Honor, what's to stop him from doing this again? How decent can a person be if their only remorse comes after they've been caught?

Please, I implore you, don't give this selfish, self-serving, deceitful man another chance to prey upon and victimize any more innocent people.
Please, during his sentencing, remember the victims he intentionally hurt.

Respectfully yours,
Laura Corcoran

2

# VICTIM IMPACT STATEMENT

**Victim: Margaret Salvioli**
**Court Docket Number:    07 CR 1071 (PKC)**

**RE: Michael Hershkowitz**

**Hon. P. Kevin Castel:**

I was defrauded of $1,534,159; which is more than a million and a half dollars, by Michael Hershkowitz and his partner at Kingsland, Ivy Woolf-Turk.  It was all my savings and that of my husband, who passed away in 1986.  I am now struggling to live on a Social Security benefit of $986.00 a month.  She also defrauded my daughter, Laura Corcoran, of $69,000 and my son, Eric Salvioli, of $8,500, which was all the savings they had.  My son is on disability, and it was not easy for him to save that amount of money.

Mr. Hershkowitz makes many statements in his "Memorandum In Aid Of Sentencing" that are either not true, or should not have anything to do with the length of his sentence.  I will attempt to refute a few of them here.

The fact that Hershkowitz has a wife and children, and that his parents are old and frail, is something he should have considered and not expect the court to have leniency because of them, when <u>he</u> did not think of them when he defrauded others, some of whom were also old and frail.

His Rabbi's and other people in the community speak of how generous Hershkowitz was and how much he has given to charity and to help others, and how giving he is; do they not realize that this was not his own money, but money he took illegally from other people, and defrauded people to obtain? This was a case of robbing Peter to pay Paul, and as far as I know, it is not considered acceptable in any religion.

Karen Hershkowitz says their family's only vacation was to go to Israel. They were able to take the whole family to Israel every year, using the money he took from others.  They bought two expensive condos in NYC and renovated them into one large unit.  Where did the money come from? Obviously from what he took from the investors!  He bought a vacation home in Atlantic Beach with the investors' money and put it in his sister's name, apparently so that we would not know he was using the money for his own purposes.

Hershkowitz claims that in 2003, he had to turn to institutional investors because the private investors did not provide the amount of money they promised, and that is why he did not record the investor's mortgages. However, he then went on to buy 15 or more properties, borrowing money each time from the private investors, and not recording the mortgages. Obviously, he had found a way to defraud the investors, and continued to do so, in order to live the lifestyle he wanted.

 Also, Hershkowitz sold a property in 2005, on which the investors had a recorded mortgage, but did not inform us of the sale, nor did he return any money to us. In 2007, when confronted with evidence by an investor that the property had been sold, he claimed to have received only a

partial payoff of the mortgage and offered to distribute that amount, while he continued to hold the balance, claiming it would be paid later on. It is quite apparent form these incidents, that Hershkowitz did not do this as a one time thing, but had found a way to defraud people and get away with it, and continued to do so. An unrecorded mortgage is the equivalent of a promissory note, and the holder cannot foreclose on it, if the mortgagor defaults on it.

In summer of 2006, I asked Ivy Woolf-Turk for an explanation of why I could not find the mortgages recorded anywhere. She offered to send me copies of the recordings, but none were forthcoming. In September, she invited me to fly to NY, stay at her house and see all the properties. She took me on a tour of them and then took me back to the office to meet with Hershkowitz. When I told him I just wanted copies of the recorded mortgages, he told me it wasn't any problem. However, I did not receive them until January of the following year, after many phone calls to Kingsland.

Of the $1,534,159 that I invested with Kingsland, I received only $24,922 back after all the properties were sold.

Hershkowitz claims he wants less time in jail so that he can get back to work because he wants to make full restitution to the investors. He cannot possibly pay me back the over $1.5 million that he took from me, much less the $27 million that he stole from all the investors.

Except for the $24,922, all the money I invested with him is gone. I had a mortgage on my home, on which I had to make payments. I could not make the payments without the income I formerly had, even though I cut out all expenses I possibly could. I stopped going out to lunch and dinner with my friends. I stopped using a Post Office Box, and I discontinued my newspaper. I have not bought a single article of clothing since May 2007 and I buy the cheapest groceries I can find. I no longer have my hair cut by a beautician, but cut it myself. I used to travel a lot, but I do not travel any longer, not even a day trip. I do not go to the movies. I have not gone to the dentist since this occurred in May of 2007, and I avoid going to the doctor, if at all possible. I do not go anywhere that I can avoid, in order to save money. I do not spend any money if I can possibly avoid it.

I had to cash in a life insurance policy to pay down my mortgage. I was forced to sell some stock I had received from my parents when they died, in order to pay down the mortgage, but which I had planned to pass on to my children when I died. I had always helped support a disabled granddaughter, which I was unable to help anymore. I had a co-op apartment in Queens, NY, that my granddaughter lived in. I had to move her to Florida to live with her mother, as I could not afford to pay the maintenance fee on it now. I have a son who lives in another state and he has been sending me money every month to help me out. I had my home up for sale for awhile, but no one even came to look at it, so I have taken it off the market, hoping the market turns around and I have a better chance of selling it, although I don't know where I will live if, and when, I do sell it.

I am 78 years old. While I once thought I had enough money to take care of myself for the rest of my life, I am now reduced to living on Social Security, and don't know if I will be able to take care of myself next year! This is taking a tremendous emotional toll on me, and I am depressed and do not sleep well anymore. I do not attend the card games that I used to look forward to

every week. I am embarrassed not to have the money to go to lunch or dinner with the other players.

There are other investors who are having similar financial problems. I trusted Michael Hershkowitz and invested all I could with his company, Kingsland. Please take into consideration what Hershkowitz' fraud has done to me and others, and sentence him to prison for as long as possible.

Sincerely yours,

*Margaret Schmidt*

**BUDD S. SCHWARTZ**

**WESTPORT, CT 06880**

December 29, 2009

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
One St. Andrews Plaza
New York, NY 10007

Re: Michael Hershkowitz sentencing

Dear Judge Castel:

Prior to the sentencing of Ivy Woolf Turk by Judge Buchwald I wrote to her, expressing my views, as a victim of the fraud. I don't feel able to do the same with you. The procedure established by Judge Buchwald provided that the letters received were passed along to the defendant but not made public. Your practice, as explained to us by Harry Chernoff, Assistant U S attorney, is to make the letters public. This practice is, in my opinion, very unfortunate.

Judge Buchwald received a great many letters from victims. You will receive far fewer because people are reluctant to publicly categorize themselves as victims and describe the terrible damage, both financial and psychological, which this fraud has caused them. You will therefore not have an input you need in considering the sentence you impose.

Very truly yours,

Budd S. Schwartz

cc: Harry A. Chernoff



**BUDD S. SCHWARTZ**

**WESTPORT, CT 06880**

January 19, 2010

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: Michael Hershkowitz sentencing

Dear Judge Castel:

I dealt with Michael Hershkowitz and Ivy Woolf Turk from the early '90's, was constantly in contact with them over the years and invested in every fraudulent loan for which they were indicted. I have read the sentencing memorandum submitted on behalf of Michael. I lack information concerning Michael's good deeds and the narrative may well be accurate. I do, however have considerable information about his business activities.

1. The memorandum discusses a loan in 2003 where investors were unable to come up with sufficient funds and a one million dollar deposit was at risk to justify putting an institutional first mortgage in front of investors (myself included) who were fraudulently induced to fund a "first mortgage" which was, in fact, an unsecured junior obligation. <u>However they did the same thing in loans preceding this one and every one after; over twenty loans!!</u>

2. The memorandum states that Ivy Woolf Turk did the fundraising, with the implication that she had the greater responsibility. In all my dealings with Kingsland it was clear that Michael was the dominant personality and the "first of equals". He had an accounting background and was very knowledgeable in finance. Ivy's strength was in advertising, marketing and the aesthetic sense she brought to the design of the renovations. There is no question in my mind that the mechanics of the fraud were designed and implemented by Michael.

3. One of the arguments in the memorandum was that the defendants did not personally benefit from the fraud. This may or may not have been true of Ivy, but it was not the case with Michael.. We made three loans to a Marcy Simpson, represented to us as a successful Long Island real estate developer. We only

discovered after the bankruptcy that she lived in a condo on Staten Island and was Michael's sister. I have little insight into the motivation behind the first loan. The second was to acquire two adjacent condo apartments on the Upper East Side and combine and upgrade them into a single 3,000 square foot residence. We found out after the bankruptcy that Michael with his family were living in the condo under a lease from his sister which included an option to buy, a scheme to mask his beneficial ownership. This loan was repaid, doubtless out of funds raised from new investors in later "mortgages". The last Simpson loan was for the purpose of acquiring a large residence in Atlantic Beach, L. I., renovating it and adding a swimming pool. We later found that this was Michael's summer residence.

4. The memorandum points out the terrible impact on his family of a prison sentence, and this is true. What also must be taken into consideration is the enormous harm he inflicted. The majority of his victims were in their 70's and 80's (I am 82) and what he took from them were their life savings at a time of life when they could not be replaced. My immediate family and I lost almost $600,000, of which more than two thirds was from my IRA account. My life and the lives of my children have been substantially affected. A number of other investors are in far worse shape, some almost destitute.

5. It has been asserted that a short sentence will enable Michael to use his talents to work and repay investors. This concept is chimerical. He will return to society a convicted felon, discredited in his industry and with no prospects for obtaining credit, essential in the real estate industry or any other business. If he is but able to support his family, that will be a major accomplishment.

For the harm he has done, the trust betrayed, the lives destroyed, and the leading role he played in orchestrating these frauds, I believe the sentence imposed on his co-defendant should serve as a floor, not a ceiling.

Sincerely,

Budd S. Schwartz

cc: Harry A. Chernoff



Katrina Dill

Palm Coast, Fl

January 20, 2010

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     Michael Hershkowitz
        Case Number 2007R01380
        Court Docket 07 CR 1062

Dear Honorable P. Kevin Castel,

I am writing this letter in hopes that you sentence Michael Hershkowitz to the maximum prison term allowed. He is a criminal and his fraudulent actions has caused a severe hardship to my son and I. We will longer have a normal life. I am a single parent of a 15 year old boy. I had put a second mortgage on my home to invest in the Kingsland Group in the amount of $115,000.00. I used the difference of the second mortgage payment and the interest payment received from the Kingsland Group for living expenses. This amount added up to about $200.00 a month. It may not seem like much, but for a single parent without child support it helped. I have been forced to use all monies in savings, retirement and my son's college fund to help cover the second mortgage interest payment. I have also been forced to take a second job for the past 2-1/2 years in an effort to make ends meet and pay the interest only on the second mortgage. My second job involves nights and weekends and has drastically infringed on the amount of time I spend with my son, that I so cherished and has forced him to cease all sports, club and school activities and any social life. This has destroyed our quality of life. My son has had to lie as to what has happened to my mother (his grandmother) as to keep her mentally stable, as she would not be able to handle the knowledge of the situation that we are in. I am in the beginning process of losing our home unless some restitution is made by Michael. We have been given a small dollar amount (approximately $2,100.00) from the sales of the properties while the trustees and attorneys (Richard Wasserman, Venable LLP and Klestadt & Winters, LLP) sought and received exorbitant amounts of money (approximately 4.2 million). We have been the victims twice, once by Michael and Ivy and then by the trustees and attorneys. Does this really seem fair? I could go on about while Michael has been out on bail he has enjoyed the freedom with his family. I on the other hand am constantly working and do not see my son and am losing our home.

It is stated that for the last 2-1/2 years he has spent time bonding with his children yet has not made any attempt to make restitution to the defrauded victims. How dare he use religion. A religious man would not have committed these crimes and destroyed the lives of so many people. He seems to have organized many charitable events. I would accept a charitable event so my son can attend college and we can keep our home. I am sure the temple would be glad to help since he has been so charitable to them financially. He could also sell his house, his asset's or cash in any insurance policies or retirement savings (as many of us have had to do) in an attempt to repay his victims. Are any of his children currently or plan on attending private schools. He also states that the real estate market had a negative impact on the sale price of the properties. I do not believe this to be a big impact. The defrauded investors could have gotten some kind of return instead of the attorney's and trustees that were required because of his criminal activity. Why is his sole worry about his family? What about the defrauded victims that he has caused so much damage to. I do not feel that Mr. Herschkowitz's sentence should be anything less than the maximum allowed. He has submitted letters from several acquaintances. What is the authenticity of these people? He has shown lighter sentences for crimes similar to his but has not shown current sentences for similar crimes with harsher sentences. **EXAMPLE: BERNIE MADOFF. NOW THAT IS JUSTICE.. I again plead with you to give him the <u>maximum</u> prison term allowed as he does not deserve his freedom after what he has done to my son and I along with all the other investors. It is a well known fact that if you commit the crime you do the time and Michael is guilty of a serious crime.** He may only get several years in prison but we will fell the effects for the rest of our lives. I also ask that any restitution paid by Michael be given only to the investors and any auction of their personal items be paid to directly to the investors. Thank you for the opportunity to state my case.

Sincerely,


Katrina Dill

cc: Harry A.Chernoff, Assistant U.S. Attorney


January 15, 2010

Honorable Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

U.S. vs. Michael Hershkowitz
07 CR 1071

Hon. Kevin Castel:

I am taking the liberty of writing to you with respect to the sentencing of the above named defendant, Michael Hershkowitz. I am doing so on behalf of my wife, Toby, and my sons, Barry and Alen. They were the victims of the fraud perpetrated by the defendant. Mr. Michael Hershkowitz.

As a former Justice of the NYS Supreme Court I retired at the mandatory retirement age of 76 Years. Presently I am 93 years of age. I continue to serve the community as a Supreme Court Judicial Hearing Officer in Queens County and as an arbitrator for an Alternate Dispute Resolution company. My wife is 90 years of age and a retired educator with the NYC Board of Education.

My wife and sons had an interest in a parcel of real property which devolved to them from my wife's father. It had remained in the family for over 60 years. They elected to sell their interest in 2005 and place the $2,000,000 they realized, into another real estate investment in order to take advantage of IRS Code Sec.1031 and postpone the imposition of a capital gain tax and to obtain a reasonable return on the investment. We are not real estate moguls. This sum was the overwhelming bulk of my wife's and sons' assets. At the time we were interested in placing these funds in IRI Code Sec. 1031 in a secure investment which qualified under IRS Code Sec. 1031 generating a reasonable financial return for Mrs. Beerman's "Golden Years".

My son, Alen, is a practicing attorney. During his legal representation of a client, he told the client the family was investigating placing the $2,000,000.00 into a parcel of real property to comply with IRS Code Section 1031.

His client stated that he knew someone who could assist us because the client had closed his laundromat business and invested the land it was situated on with the individual, Michael Hershkowitz. We were advised by my son's client that Hershkowitz was regarded to be a well respected member of the community, a prominent member of his temple, reputedly owned several parcels of real property and was actively engaged in real estate management and development.

A meeting was arranged at the home of my son's client, who parenthetically, was also defrauded by Hershkowitz, and as a result is now on the verge of his own bankruptcy. At that meeting, Hershkowitz, who knew we were observant Jews, appeared wearing a yamulka, the traditional skull cap of Judaism. Also attending was his co-conspirator Ms. Ivy Woolf Turk, who has since received a 5 year prison term for her participation in this fraudulent scheme. Ms. Turk's interaction with our family was minimal. The only time we met her was when we tendered the checks to Hershkowitz. All dealings were with Hershkowitz. He was the principal party in charge of making all representations and decisions.

He espoused his extensive real estate management and experience. He outlined the many successful ventures he had been in and was the current owner of several parcels of property in which a 1031 investment may be successfully accomplished. He represented and assured them that if my family invested the $2,000,000 with him he would insure the safety of the principal and deliver a monthly return of 10% with the principal being returned in approximately eighteen months. He was fully aware of the origin of the money and absolutely knew we needed to retain real property or it would a breach on the "1031"exchange and my family would be subject to a capital gain tax approaching $500,000. It is important to note that this transaction must be viewed on the financial climate at that time and 10% was not unreasonable in light of traditional lenders offering 5% to 7% returns. The suggested return of 10% did not appear to be excessive and would be meaningful to all at this state of our life.

At that meeting arrangements were made for my family to turn over the sum of $2,000,000. The sum represented the bulk of the accumulated life savings of my family.

In a contrived and orchestrated attempt to further establish his credibility Hershkowitz met with my family at the premises of the real property he was sponsoring. In the same manner as unscrupulous hucksters of the old west who "salted" a worthless mine with gold dust and sold it to unsuspecting prospector.

Hershkowitz, showcased one apartment which he refurbished. He specifically pointed out, in detail, its proximity to the Yeshiva University in the Washington Heights area of Manhattan and after he would refurbish all the apartments with my family's additional funds this endeavor would be of a great benefit to the students and general Jewish community.

In our specific case, we invested in two specific properties. Apparently, Hershkowitz has absolutely no remorse for the fraud he perpetrated on my family. His

actions have not even merited one line in his 85 page diatribe. In our instance, he persuaded us to invest as co-owners and then proceeded to rape all of the equity out of the property. When he realized the real estate boom of 2007-07 increased the value by one million dollars, rather than giving us the opportunity to recoup one half of our investment, he refinanced against and sucked out every penny of the remaining equity, insuring my family would end up with absolutely nothing.

The 85 page memorandum submitted on the defendant's behalf is replete with remorse and the consideration he has for his family and children. "Each person who submitted a letter in "support of Mr. Hershkowitz-whether a family member, religious leader, friend or acquaintance—describes the remorse, regret and shame that Mr. Hershkowitz has expressed—for his conduct." However, obvious by its omission are any references to the family and children he victimized by his cold, well planned and calculated "ponzi" plan depriving them of their life earnings. He proudly boasts of his "charitable" contributions he made with the ill gotten fraudulent funds he stole from his victims.

The defendant brazenly states "Of course, in the two and a half years since his arrest, Mr. Hershkowitz has not committed another crime." What a commendable achievement of rehabilitation. After deliberately establishing himself a credible and trustworthy reputation the defendant embarked on an embezzling career affecting and depriving elderly victims of their life savings. When he is finally apprehended for his felonious and unlawful activities he is now proud to state he has not been re-arrested.

He indicates repeatedly that he wants to work again to compensate the victims of his Ponzi Scheme. He asserts his crime **only** involves the loss of 27 million dollars. A careful review of the 85 pages seeking mercy, does not even address the fraud he perpetrated on our family. We did not give a mortgage. He brought us into his web in making my family co-owners of two properties in exchange for our 2 million dollars of life savings. He fraudulently told us our life savings were secure. Clearly by the time he approached us he knew we would lose the entire investment. The actual fraudulent activity the defendant engaged in was **not** a 27 million dollar or 29 million dollar fraud. It was actually that amount **plus** the net value of the bankruptcy sale, which was approximately 52 million dollars, for a total of 81 million dollars. That is the true amount Hershkowitz stole.

It is interesting to note Hershkowitz has informed the Court his co- defendant Ms, Ivy Wolf was sentenced to a five year incarceration. That he should receive greater consideration because of his assistance against his co-defendant.

The defendant alleges he should be entitled to leniency because he is cooperating with the bankruptcy trustee. He created the bankruptcy and now asserts his cooperation should merit mercy, His singular actions have caused my family to be named as defendants in the bankruptcy proceeding. In the course of Hershkowitz's fraud he repaid us abut 10% of our investment, **with our own money.** That is the essence of the Ponzi scheme. The trustee is now seeking every dime we received from the defendant. To date, we are

encumbered to pay in excess of $50,000 in legal fees in addition to any sum we have to pay back the Trustee. Our family continues to endure the additional physical and mental distress this defendant has perpetrated.

It is important to note Ms.Ivy Woolf-Turk was a minimal factor in this fraudulent scheme. She did not participate nor was she any factor involved with our family. Except for her only attendance at the initial meeting with Mr.Hershkowitz she did not participate in any manner, shape or form. Mr. Hershkowitz was the main character and only principal we dealt with making all representations and decisions and who received the $2,000,000.

It is interesting to note that Hershkowitz's arrest pre-dated the downfall of Bernard Madoff by one year. Although Madoff affected the lives of hundreds, perhaps thousands of investors, the actions of this defendant were no less severe on the victims he swindled. As a former Supreme Court Judge, presiding in the Criminal Term, I had the opportunity to be involved in hundreds of cases and sentenced a myriad of souls to terms of incarceration ranging from one day to 25 years. I have counseled victims and explained in our civilized system of jurisprudence we do not espouse an "eye for an eye." Although it sometimes appears that a period of incarceration may be a paltry substitute for actions which permanently alter or destroy lives, it is the only form of justice we have. I would respectfully request your Honor's sentence is commensurate with the nefarious acts of the defendant and affects upon his scores of victims.

Thank you for your consideration.

Respectfully,

Leon A Beerman


Hon. P. Kevin Castel                          January 20, 2010
United States District Judge
Southern District of New York
500 Pearl Street
New York NY 10007

Dear Judge Castel,

In November of last year I wrote to you in response to the victims notification that I
received RE:  United States v. Defendant(s) Michael Hershkowitz, Case Number
2007R01380 and the forthcoming sentencing hearing.  I have attached that letter
for your reference.

Now that the Hershkowitz sentencing memo has been filed and distributed I feel
compelled to respond to its fables, misrepresentations and falsehoods.

First and foremost, the memo makes it appear that Mr. Hershkowitz made only one
mistake or committed only one illegal act.   In reality the defendant was involved in
a scheme that involved approximately twenty separate real estate investments and
defrauded more than 70 individuals of nearly thirty million dollars.  The fraud was
not one event but more than a thousand events over seven years involving the
forging of numerous documents, lying to investors and the use of the U.S. Postal
service to further the crime.  As a victim I see this as numerous and determined
repetitions of a crime, not one event and one count!

Second, the attempt in the sentencing memo to cast Mr. Hershkowitz as a deeply
religious, moral and ethical individual ignores the fact that while he was involved in
his religious pursuits he was consciously stealing the life savings of numerous
individuals.  Even more detestable was his generosity and subsequent self-
aggrandizement in his community via his charitable donations using money stolen
from us, his trusting investors.  Other examples of his generosity include letting his
sister occupy multi-million dollar properties free of rent, paying excessive fees for
questionable services to his friends and relatives, etc.

Third, consistent with his immorality is the attempt in the sentencing memo to lay
more of the blame on his co-defendant Ivy Woolf-Turk. He notes that she forged a
document when their fraud was almost compromised.  Well in fact they forged
together hundreds of documents over many years including first mortgage
certificates, insurance riders, appraisals, etc.  This is a transparent strategy to lay
more of the blame on Ivy Wolf-Turk now that she has been sentenced.

Fourth, while I realize that Mr. Hershkowitz's sentence is independent of Ivy Woolf-
Turks sentence his relative role in the crime must be taken into account.  Anyone

who did business with Kingsland and had direct involvement with the two perpetrators knows that Mr. Hershkowitz was the driving force in the organization. Ivy Woolf-Turk was a willing, aware and active participant but more of the blame for the crime must be placed on Michael Hershkowitz's shoulders. As such his sentence should significantly exceed that of Ivy Woolf-Turk's sentence.

Fifth, the attempt in the sentencing memo to minimize the amount of damages experienced by the victims has no validly or basis in fact. The fact is, that the investors lost nearly $30,000,000 and would not have had those losses if they held valid first mortgages. Our falsely obtained money was used to entice the banks into investing and the banks, who did have the valid first mortgages, did not lose any of their principle. Additionally, the purported and speculative Ock-Ziff deal, if real and agreed to by the lead investors and closed, would have entrapped them into the fraud. Other investors who were party to the "deal" will explain this in more detail.

Sixth, the list of "similar cases" in the sentencing memorandum appears to be a selective group of examples that are biased toward a lighter sentence. I am sure you recognize this and also understand that each case has unique and individual circumstances.

Finally, I hope you can see past the heart rendering, sympathetic, compassionate plea for mercy constructed by his lawyers. Unfortunately most of the pleas and sympathy comes from people who benefited from Mr. Hershkowitz's crimes. More important to consider are the numerous victims who have lost all or a substantial portion of their life savings. Most of these investors are not wealthy people and their $25,000 to $250,000 investments are a substantial portion of their savings. These losses will have a long-term impact, affecting not only the victims during their lifetimes but also their children and grandchildren. Victims and their families will be deprived of college educations, proper medical care and justly deserved retirements.

Since the plea agreement already ignores the multiplicity of the crime then the only just punishment should be an imposition of a penalty greatly in excess of Ivy Woolf-Turks sentence if not the maximum formula based penalty of 17 years. It is my plan to attend the sentencing hearing and speak to the above points.


Yours truly,



Fredric K. Rosen

Cc: Harry A. Chernoff
     Assistant U.S. Attorney
     U.S. Department of Justice



Fredric K. Rosen

Weston, CT 06883

Hon. P. Kevin Castel                    January 17, 2010
United States District Judge
Southern District of New York
500 Pearl Street
New York NY 10007

Dear Judge Castel,

This letter is in response to the victims notification that I received RE: United
States v. Defendant(s) Michael Herskowitz, Case Number 2007R01380 and the
forthcoming sentencing hearing.

To put it briefly and bluntly, I am shocked at the audacity and leniency of the plea
agreement. The defendant was involved in a scheme that defrauded more than 70
individuals of at least thirty million dollars. The fraud was not one event but
numerous events over many years, involving sixteen separate real estate
investments, the forging of numerous documents and the use of the U.S. Postal
service to further their crime. As a victim I see this as numerous and determined
repetitions of a crime, not one event and one count!

It should be noted that the victims are unlikely to recover any of the nearly $30
million in embezzled funds. Many of the victims of Hershkowitz and Woolf-Turk
have lost all or a substantial portion of their life savings. Most of these investors
are not wealthy people and the $25,000 to $250,000 is a substantial portion of their
savings. These losses will have a long-term impact, affecting not only the victims
during their lifetimes but also their children and grandchildren. Victims and their
families will be deprived of college educations, proper medical care and justly
deserved retirements.

Since the plea agreement already ignores the multiplicity of the crime then the only
just punishment should be an imposition of the maximum penalty of 20 years. I am
anxiously awaiting the conclusion of the case that hopefully will, to some degree,
provide a just punishment. It is my plan to attend the sentencing hearing and
speak to the above points.

Yours truly,

Fredric K. Rosen

Cc: Harry A. Chernoff
      Assistant U.S. Attorney
      U.S. Department of Justice



*Joremi Enterprises, Inc.*

*New York, NY* 10019

1/20/10

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      re: United States of America v Michael Hershkowitz

Dear Judge Castel:

I am the President of Joremi Enterprises, Inc. and the Managing Member of Crestwood Associates LLC. These two entities, my late father and I invested $3,800,000 with Michael Hershkowitz, Ivy Woolf-Turk and the Kingsland Group et al, and were defrauded by them of the entire amount. Joremi Enterprises, Inc. is a two-family company, with 21 shareholders made up of brothers, sisters, nieces, nephews, cousins and mothers, ranging in age from 10 to 83. Crestwood Associates LLC is also a family venture. My late father, Hilton Schwartz and I also invested as individuals with Kingsland. This group entrusted $3,800,000 to Michael, Ivy & Kingsland, all of which — both the principal and decades worth of future earning potential — has now vanished due to fraud. Joremi and Crestwood were both established by my father and his business partner and intended to help provide for the education and well-being of their children and grandchildren. This money has now been stolen from our families; the distributions we are able to send to our relatives have been forever diminished, the college fund contributions reduced, their futures that much less secure.

Adding emotional salt to the financial wounds is that my father (who was the President of Joremi Enterprises and the Managing Member of Crestwood Associates until his death in Sept. 2007) was forced to spend literally hundreds of hours of what turned out to be the last summer of his life in meetings, discussions, conference calls and general anguish, trying to help resolve the terrible situation we had been placed in by Michael and his co-conspirators — hours that should have been spent on the golf course, and with his wife and his grandchildren — even, finally, hours spent working to try to ameliorate some of the ill effects of the fraud from his hospital bed after his heart attacks.

I did not know Michael outside of a business context, so I have no direct knowledge of his described relationships with family and friends. I note, however, that outside of *his* Ponzi scheme, Bernard Madoff was similarly described as warm, charitable, well-regarded, respected, loving, generous, valued and the like. It's a lot easier to be very charitable when you've misappropriated millions of dollars of other people's money.

Michael's business discussion in his Sentencing Memorandum is the same combination of misdirection, false assumptions, and (quite probably) self deception that characterized his criminal enterprise. He claims that Kingsland was a well-run business prior to the discovery of the fraud, that, after the *lis pendens* was filed in May 2007, if we had just sat back quietly and let them go through with the Och-Ziff deal, everything would have been OK and no one would have been hurt. This is a pure wish-fulfillment fantasy based on impossibilities. It is as if Bernie Madoff were to have claimed that everything would have been fine if everyone had just kept investing more money with him.

*Tel* 212.342.7490    *Fax* 212.342.7491

Without going into a line-by-line rebuttal of the Sentencing Memorandum, among the reasons Michael's claims are unsupportable are:

- the only way a sale to Och-Ziff could have gone through would have been for those few of us who first discovered the fraud to have aided and abetted Michael and Ivy in continuing to defraud others;

- as evidence of the fact that the Och-Ziff deal was predicated upon the unsecured creditors joining the fraud, Michael and Ivy required that as part of the proposed hedge fund deal: (1) the *lis pendens* that prevented Michael and Ivy from fraudulently transferring any properties would have to have been released before closing the deal, (2) there could be no mention of our unsecured mortgages or the *lis pendens* to Och-Ziff and (3) confidentiality agreements from 100% of the unsecured creditors would have to be supplied subsequent to the closing;

- there were dozens and dozens of unsecured mortgage holders, most of whom knew nothing of the fraud at the time the Och-Ziff deal was being discussed; even had such a deal not entailed participating in the fraud, we had no way to contact them all for their approval of a sale to Och-Ziff; without that approval, there was no authority to settle any deal with Michael and Ivy;

- since there were other property owners not involved in the fraud, Michael and Ivy were unable to legally sell the portfolio and use all the proceeds to pay off fraud victims, as the 50% co-owners certainly would not consent to use of their money to pay off the fraud victims;

- even if the fraud were improperly continued and the Och-Ziff deal had closed at the proposed $60,000,000, after the banks, the co-owners and transfer taxes had been paid, there would have been substantially less than $10,000,000 to pay off the $27,000,000 of fraud debt, with no one with the authority or ability to allocate the money; additionally from this balance, Michael and Ivy were supposed to have to been paid $1.5 million at the outset;

- if we had nonetheless somehow still gone along with the Och-Ziff deal, it also would have required that the business be continued and expanded under Michael and Ivy's management and control, thereby further continuing the fraud and making us ongoing business partners with known liars and thieves; any possibility for our receipt of the shortfall would have been dependant upon Michael and Ivy's future venture with Och-Ziff, a venture that would have been based on fraudulent premises and one likely to be short lived.

Throughout the Och-Ziff proceedings Michael insisted that they had done nothing wrong and had treated us honestly and fairly; perhaps he had even somehow deluded himself and believed these outrageous lies to be true. Michael also seems to be saying that since we didn't decide to join the fraud, to become criminal co-conspirators and silently consent as Och-Ziff was surely about to be defrauded on a larger scale, then any losses and costs due to the decline in the market, the cost of the bankruptcy proceedings, the additional mortgage interest and penalties, professional fees, etc. are all the victims' faults. His real estate business was a house of cards, his OZ deal as unreal as Emerald City, yet Michael brazenly requests not to be held fully responsible for the real, irrefutable, demonstrable losses and harm caused by his criminal behavior.

At the heart of the matter is that it is incontrovertibly wrong for the Court to even contemplate that a criminal's sentence should be mitigated on the theory that the victims might have recovered more if they had let the scheme continue unabated. When someone defrauds so many people of so much money, and causes suffering and anguish in so many families, justice demands requisite punishment. Financial restitution appears to be an impossibility. A prison sentence shorter than that of his subordinate partner in crime Ivy Woolf-Turk would be a travesty.

Respectfully,

*Evan Schwartz*
Evan Schwartz

cc: Harry A. Chernoff, Assistant U.S. Attorney



Donna Spector
Joremi Enterprises

New York, New York 10019

OVERNIGHT DELIVERY

January 20, 2010

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: Michael Hershkowitz

Dear Judge Castel:

"Thou shalt not utter a false report; put not thy hand with the wicked to be an unrighteous witness." (Exodus 23:1) Michael Hershkowitz argues that the value of the property, as measured by the alleged hedge fund deal with Ochs-Ziff would have allowed for payment of all bank loans and investor loans in full. The fundamental problem with this argument is that silence is a form of falsehood. Once the crime was uncovered, my business partners and I sat across the table from the defendants who screamed at us that "IF ONLY" we allowed them to proceed with the hedge fund sale, all would be well. How could we, already knowing of the path of lies and deception that the defendants willingly chose, allow others to be victims of the crime while we stood idly by and recouped our funds (if that was even realistic)? We had a moral, ethical and legal obligation to turn the defendants over to the authorities and stop the hedge fund deal before anyone else was harmed. The financial loss and emotional pain was devastating to all of us, but there was no way that we could perpetuate the crime and collaborate in the ongoing scheme. The mere fact that the defendants even try to present this as their defense, further demonstrates the depth of their shallowness and selfishness. This scheme was a house of cards built on smoke and mirrors that would have collapsed no matter what and the only difference if we had let the hedge fund deal proceed would have been that we would have been among the guilty.

Hershkowitz also argues that subsequent events, such as the bankruptcy and the professional fees associated with the bankruptcy should not be considered in determining his sentence. Our path of last resort was to force the portfolio into

bankruptcy. We were only too aware of the costs involved in the bankruptcy proceedings, but we had no choice. It is absurd for this criminal, pretending to be pious, to contend that the bankruptcy costs should not be considered in determining his sentence when the only reason for the bankruptcy proceeding was his greed and deliberate contemptible acts. Real people lost their life savings as a result of the illegal and reprehensible actions of Michael Hershkowitz. How could there be justice if the lives of the victims are devastated, while the criminals walk freely with no consequences.

I am the Vice President of Joremi Enterprises which is a company built by my late father and his business partner who passed away during these proceedings. When we first met Mr. Hershkowitz and his partner, they enthusiastically walked us through buildings that they were buying and renovating, promoting the benefits of investing with them as first mortgage holders. Maybe we should have invested instead in the makers of "white out" since it seems as though gallons of it was used to doctor and falsify hundreds of pieces of paper that were presented to us and others as legal documents. My older siblings and I and our 82 year old mother are all shareholders in this business that my father built. Our company lost three million dollars in this ponzi scheme which represents a substantial loss of our assets. In addition, my mother personally lost another hundred thousand dollars and my business partner's family lost nearly another million dollars.

There are no valid reasons that the sentence given to Michael Hershkowitz should be lenient. Religion cannot be used as a wall of false integrity. Mr. Hershkowitz deliberately and knowingly deceived us and the other innocent investors and as a result we are all left with a compromised lifestyle. The timing of this sentencing hearing has been delayed, but in this case time has not healed and the lapse in time is no reason to diminish the sentence.


Sincerely,

Donna Spector

Donna Spector

CC: Harry A. Chernoff, Assistant U.S. Attorney



New York, NY ▇▇▇
January 20, 2010

Letters re: Michael Hershkowitz
Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: Michael Hershkowitz sentencing

Dear Judge Castel:

As a victim of the activities of Michael Hershkowitz, I feel compelled to respond to his sentencing memorandum and express how his actions have impacted my life.

I think it is terrible that having committed these crimes and defrauded so many people, Mr. Hershkowitz now wants to quote people who claim he has been generous: that was *my* money he was giving away when he subsidized the cost of building a chapel, supported his sister and friends financially, etc. He asks for mercy of the court because he realizes his actions had consequences to him and his family: should he not have considered that *before* he committed the crimes. And then, he wants to tell you what a religious person he is and why that is a reason to go easy on him: I don't know exactly what he learned during his religious upbringing, but one of the ten things I learned early in my religious education was "Thou shalt not steal."

I, too, have a sister. She lives alone, doesn't make much money and suffers from chronic asthma. She's a life-long renter and I had hoped to some day help her buy a home in which she could escape some of the health problems that are brought on by environmental factors in her apartment. Thanks to my losses with the Kingsland fraud, that is no longer a possibility.

Personally, I felt a lot of anger after the fraud was uncovered. I thought that I was investing in something that was secure. Instead I have been cheated out of money that I worked hard to earn, that I had saved rather than splurging and that I had invested carefully – clearly not carefully enough.

I invested $220,000 in Kingsland. I do not believe that Kingsland could have serviced their bank mortgages along with the loans made to people like me. Any interest I earned on this money was merely the return of principal from later investors, including myself. I basically lost this money along with the opportunity to invest it from the day it was given to Kingsland until I die. So to truly calculate the value of my loss, I would have to consider what a modest return on this principal would be over the remainder of my life: I was less than 50 years old at the time this fraud was perpetrated.

In addition to my anger at Mr. Hershkowitz, I was sad after learning what really happened to my money. I also experienced a period of time when I did not sleep very well. Because I do not care to discuss my financial situation with others, even family members, I think I bottled up a lot of these feelings for longer, and to my detriment. When I was the victim of other crimes, I have not felt any reason to hold back my feelings from my family members – but this crime has been different.

Mr. Hershkowitz conspired to defraud many people. It is clear from the documentation that Kingsland, and he as one of its principals, took out mortgages under a false pretense. They represented that these were secured primary mortgages when in fact they were completely unsecured loans. This fraudulent activity is not only reprehensible, but it violated the trust we had put in him and his business partner.

Not only was I fooled once, but Kingsland repeatedly forged documentation to make it look like a series of investment packages that were safe and sound. While he may have plead guilty to only some of the charges, it is evident from my losses that he and his partner engaged in a serial behavior of deception concerning the loans we made to them. If he felt any remorse about the activity he was engaged in, why did he not cease this activity after the first time? Clearly he felt comfortable repeatedly stealing my money with several rounds of loans made under false pretense.

These were never investments and there is no situation in which this ever-expanding scheme would have led to beneficial outcome for its victims – except perhaps through additional illegal actions. Like a Ponzi scheme, it relied on always bringing more people into the circle, and thus funding its "returns" from new "investments." The activity was criminal and I would hope that your decision will turn a blind eye to any arguments that might make you think it was not a very serious crime.

It would be a travesty to let him off without serving any time in prison. Stealing millions of dollars from a sizeable group of investors is not something that deserves the formality of a slap on the wrist. A light sentence will not represent the pain and aggravation caused by Mr. Hershkowitz. I believe it will also send the wrong message to others about the serious nature of white-collar crime. For this reason I strongly encourage you to include a period of imprisonment for Mr. Hershkowitz as you decide his fate.

I appreciate your taking the time to read my thoughts on this matter. I hope you will consider this and therefore sentence Mr. Hershkowitz to many years in prison.


Respectfully,

Robert K Fitterman