## BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN

ANDREA ZELLAN
KAREN A. NEWIRTH
MARC AGNIFILO ADMITTED IN N.Y. AND N.J.

MARK M. BAKER
OF COUNSEL

January 26, 2010

**BY HAND**
Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   **United States v. Michael Hershkowitz, 07-CR-1071(PKC)**

Dear Judge Castel:

As the Court is aware, we represent the defendant, Michael Hershkowitz, in the above captioned matter. We have previously submitted a substantial sentencing memorandum[1] together with forty-five letters (the "Sentencing Submission") supporting our request that your Honor impose a sentence equal to or less than the sentence imposed on Mr. Hershkowitz's co-defendant, Ivy Woolf-Turk. We now write in response to the government's sentencing submission filed on Friday, January 22, 2010.[2] While we write because we must clarify or correct certain issues raised by the government, we do wish to emphasize that we believe that the central issues at this sentencing are Mr. Hershkowitz's significant, truthful and complete cooperation (Gv't Sent. Mem. at 15-19) and maintaining parity with the sentence of Mr. Hershkowitz's co-defendant who, as the probation department and the government concede, was equally culpable, was sentenced to 5 years imprisonment by Judge Buchwald of this Court, despite the fact that she did not cooperate with the government and in fact lied to the government in an attempt to shift blame for her criminal conduct to Mr. Hershkowitz. Gv't Sent. Mem. at 14-15, 16-18 & n.6.

In responding to the government's submission, counsel must refute the claim that Mr. Hershkowitz received more than $6.6 million in payments to him or for his benefit in connection with his partnership in KGP. Gv't Sent. Mem. at 11-

---

[1] Citations to defendant's sentencing memorandum take the form "Def. Sent. Mem.".
[2] Citations to the government's sentencing memorandum take the form "Gv't Sent. Mem."

## BRAFMAN & ASSOCIATES, P.C.

12. The government bases its claim on an exhibit it states was admitted into evidence at the Bankruptcy Court's hearing on the confirmation of the Chapter 11 liquidation plan.[3] *Id.* at 11. Because Mr. Hershkowitz is not represented in connection with the bankruptcy proceeding because he has no funds[4], neither he nor counsel had reviewed this document prior to Thursday, January 21, 2010, when the government provided it to counsel. We have spent the intervening period reviewing the document and we now endeavor to provide the Court with an accurate analysis of the document (despite the fact that we have no access to KGP's books and records or any other documentary backup). Under our analysis, which we believe is supported by the face of the document, we have concluded that the maximum amount of payments that can be said to have been made to or for the benefit of Michael Hershkowitz is $1,707,430.85 which must be further reduced to $1,013,653.89 after crediting him, as the Trustee did, for proceeds from the sale of the Bridle Path property ($172,224.96) and proceeds of the refinancing of the 85th Street property ($521,552.00). Trustee's Schedule at 50.

The Defendant's Financial Benefit

Because Mr. Hershkowitz is not represented in connection with the bankruptcy proceedings, Mr. Hershkowitz has only now reviewed the document, identified as "Trustee Exhibit J" and entitled "The following is a summary of payments (other than those identified as purported compensation) made by The Kingsland Group, Inc. and KG Property Associates, Inc. to or on behalf of Michael Hershkowitz January 1, 2001 through September 30, 2007". This document allegedly identifies over $6.6 million in payments to Mr. Hershkowitz during the period January 1, 2001 through September 30, 2007. Mr. Hershkowitz has never had the opportunity to review the backup for this Schedule and therefore cannot comment on its accuracy.[5] A review of the Schedule itself demonstrates that the amount of payments to Michael Hershkowitz is overstated by at least $6,482,903.96. Thus, while we now agree that the defendant benefited from his partnership in KGP and from his fraudulent conduct beyond that which was identified as compensation, the value of that benefit is much closer to $1,013,653.89 [6] rather than the more than $6.6 million alleged by the Trustee and adopted by the government.

---

[3] References to this document take the form "Trustee's Schedule".
[4] Criminal counsel was retained soon after Mr. Hershkowitz's arrest and the modified fees were paid by members of Michael's community who came to his aid.
[5] We do note, however, that in our review we have identified various typographical or clerical errors. For example, at page 16-17, it appears that an entry for moving expenses in the amount of $3,056.75 was duplicated. On page 41, a payment of $2,165.87 is included despite the memo reading "VOID".
[6] Where we have been unable to identify the beneficiary of a payment, we have attributed it to Mr. Hershkowitz, despite the fact that we do not believe that all of these unidentifiable payments were in fact made to Mr. Hershkowitz or for his benefit. We have made this concession as part of our best effort to reach a number that most closely resembles the amount Mr. Hershkowitz received without the benefit of the backup materials, corporate books and records or sufficient time to complete a full analysis of same.

## BRAFMAN & ASSOCIATES, P.C.

Below we attempt to describe, without the benefit of any records, the identified errors in the Trustee's schedule. We also note as an initial matter that Mr. Hershkowitz used his personal charge cards for KGP expenses (a practice not shared by his partner). Thus, the majority of the charges on Mr. Hershkowitz's credit cards were for supplies purchased for the company. For example, charges to "PC Richard" represent the purchases of appliances for the KGP properties. This presents a problem in our accounting for payments of credit card bills where there is no notation in the memo field, as it is impossible to tell which credit card charges were related to the business, and which were for Mr. Hershkowitz's personally. Similarly, because Mr. Hershkowitz spent most of his time "on the ground" at the properties, he often made payments from his personal funds to workers or for supplies, which payments were subsequently reimbursed by KGP. We address each category of payments in turn.

### 1. Properties Owned by KGP

Each of the properties that are alleged to have belonged to Mr. Hershkowitz[7] were in fact KGP investment properties that were used to a greater or lesser degree by Michael Hershkowitz and his family during the period that the properties were held. This use does not convert them into "his" properties and while reasonable minds may differ about how to quantify the benefit derived by Mr. Hershkowitz for the temporary use of these properties, the number does not remotely approach the amount identified for each property by the Trustee.

The investment plan with respect to these properties was the same as the plan for the rental buildings: purchase low, renovate, refinance and resell. This plan was successfully executed for each of these properties, save 72 Kings Avenue, which was sold by the bankruptcy Trustee. Thus, amounts spent on the purchase, renovation and maintenance of these properties should not be categorized as payments to Mr. Hershkowitz.[8] Nevertheless, the Trustee's schedule shows that, for these properties, the initial purchase price[9] together with monies paid for renovations and upgrades, interest and taxes, mortgage and maintenance fees and transactional costs were improperly attributed to Michael Hershkowitz. For the purposes of this discussion, in our calculation, we have attributed all mortgage and maintenance payments for the 85th Street property to Mr. Hershkowitz because it was his primary residence.

#### a) Treescape

In the case of Treescape, the property was purchased in 1996 for approximately $150,000.00 and renovations were made for an additional

---

[7] These properties are: 150 East 85th Street, New York, New York ("85th Street"); 49 Bridle Path, Westhampton, New York ("Bridle Path"); 72 Kings Avenue, Atlantic Beach, New York ("Kings Avenue"); and Treescape, East Hampton, New York ("Treescape").
[8] Defendant does not contest that he received the benefit of the use of these properties during the period they were held – nor does he contest that investors were not informed that he would be using the properties, particularly the 85th Street property (which he used as his primary residence).
[9] The purchase price was not included for the Treescape property.

3

**BRAFMAN & ASSOCIATES, P.C.**

$30,000.00 (approximately). In addition, during the summers of 2001 through 2004, the property was rented at a profit over and above the annual cost of ownership (mortgage, maintenance and other fees). This rental income is not shown on the Trustee's schedule. Finally, Treescape was sold in 2004 for approximately $550,000.00. The sale proceeds are not accounted for in the Trustee's Schedule. Instead, the Trustee mistakenly identifies $91,023.26[10] as payments to Michael Hershkowitz which were in fact payments on the investment property owned by KGP, broken down as follows: mortgage, interest and taxes ($85,630.86); maintenance and related fees ($2,222.40); and transactional costs ($3,170.00). See Trustee's Schedule at 28-33.

    *b) Bridle Path*

With respect to the remaining properties, the errors are even more egregious as portions of the purchase price as well as the payoffs of investors after refinance are mistakenly identified as "payments to Michael Hershkowitz." Thus, in the case of Bridle Path, which was purchased in 2001 for $555,590.00 (Trustee's Schedule at 17) and renovated for approximately $370,000.00 and ultimately sold for approximately $850,000.00, the Trustee's Schedule identifies a total of $1,863,110.44 in "payments to Michael Hershkowitz" for the Bridle Path property. Trustee's Schedule at 21. As with the Treescape Property, this number does not represent payments to Michael Hershkowitz but rather payments in connection with a property that was owned by KGP, used by the Hershkowitz family, refinanced (from which the investors were repaid in part) and then sold (from which the investors were repaid in full). We have reviewed all of the payments identified and, based on the payee and/or memo, have concluded that all but several which cannot be identified due to lack of information[11] were payments made to third parties directly in connection with the purchase, renovation, maintenance, refinancing and ultimate sale of Bridle Path.[12] So, for example, in addition to including the purchase price of $555,590.00 in the Schedule, the Trustee also includes $653,000.00 in monies *returned to investors* upon refinancing and then final sale. Trustee's Schedule at 21. In addition, the Trustee's Schedule includes $251,073.67 in payments of interest to investors in connection with this property, identifying same as such in the description of the name of the payee. *Id.* Thus, without even looking to the additional payments identified, the amount of alleged "payments to Michael Hershkowitz" in

---

[10] Treescape-related payments are set forth in the "Loan Michael Hershkowitz" account portion of the Schedule, at pages 28-50.

[11] The unidentifiable payments total $29,938.76. Trustee's Schedule at 18. We believe that the backup would show that these payments were not made to Mr. Hershkowitz, but are willing to assume for the sake of this discussion that they were made to him. In addition, the schedule identifies moving fees of $3,056.75 (Trustee's Schedule at 16) which could arguably be attributed to Mr. Hershkowitz, despite the fact that the items moved included KGP storage as well as furnishings that were used to the ultimate benefit of KGP upon sale of the property. Even assuming that these payments were made to Mr. Hershkowitz – which we do not believe they were – payments to Mr. Hershkowitz in connection with this property cannot be said to total more than $32,995.51.

[12] The Trustee's Schedule does include, in this instance, profits from the sale of Bridle Path. Trustee's Schedule at 50 (identifying sale proceeds as $172,224.96).

4

**BRAFMAN & ASSOCIATES, P.C.**

connection with Bridle Path must be reduced, as an initial matter, by $1,459,663.67, from $1,863.110.44 to $403,446.77. As discussed *supra* at note 7, all but $32,995.51 of this remaining $403,446.77 were payments made directly to third parties in connection with the ownership of Bridle Path, and were *not* payments made to Michael Hershkowitz. Thus, the portion of the Trustee's Schedule relating to Bridle Path overstates the payments to Michael Hershkowitz by a full $1,830,114.93, at a minimum.[13]

    *c) Kings Avenue*

Kings Avenue was purchased in 2006 for $2.1 million and, after approximately $250,000.00 in renovation, was sold by the Trustee for $2.1 million. As with the other properties discussed *supra,* the Trustee's Schedule mistakenly identifies $1,482,849.18 in "payments to or on behalf of Michael Hershkowitz" in connection with the Kings Avenue property that were in fact made to third parties in connection with the purchase, renovation, ownership and sale of this property. Once again, this total includes a portion of the purchase price of the property (together with related closing fees, $717,500.31) (Trustee's Schedule at 21); commission payments to certain investors who raised funds ($42,380.00) (*id.* at 21-22); mortgage, interest and taxes ($266,572.92) (*id.* at 22-26); payment of interest to investors ($167,868.49) (*id.* at 26). Thus, as a starting point, the $1,482,849.18 related to Kings Avenue must be reduced by $1,194,321.72, to $288,527.46. Of this remaining amount, our review demonstrates that the vast majority of these payments were made in connection with the renovation, maintenance, and upkeep of this property. Payments totaling $38,352.19 are unidentifiable based on either a lack of sufficient memo or payee notation, and while we do not believe that these were payments made to or on behalf of Michael Hershkowitz, we will accept them as such for the purposes of this discussion, since we cannot provide any proof that they were made to third parties, as we can with the vast majority of the payments identified. The remainder of funds were clearly spent on supplies, renovation and related ownership expenses. On this analysis, the maximum possible amount of payments made to or for the benefit of Michael Hershkowitz in connection with Kings Avenue was $38,352.19, not the alleged $1,482,849.18. Trustee's Schedule at 27.

The Trustee also identifies accounting payments relating to Kings Avenue – Accounting in the amount of $2,153.50. Of this amount, $953.50 is clearly related to the corporate entity and not for the benefit of Michael Hershkowitz. The remaining $1,200.00 appears to be personal to Mr. Hershkowitz. The consulting fees to Mr. Hershkowitz's sister, Marcy Simpson, were to compensate Ms. Simpson for her participation in buying and closing on various properties, including Kings Avenue and 85th Street. Given that Ms. Simpson is Mr. Hershkowitz's sister and that the investors were not informed of that relationship, we are willing to accept these payments as for the benefit of Mr. Hershkowitz.

---

[13] Additional expenses relating to Bridle Path are included in the section detailing payments from the "Michael Hershkowitz Loan Account." These expenses are addressed *infra* at Section 4.

5

BRAFMAN & ASSOCIATES, P.C.

*d) 85th Street*

The 85th Street property presents a slightly more complicated case, as Mr. Hershkowitz and his family have lived there as their primary residence since 2005. Pursuant to an agreement entered into with the government in connection with this case, Mr. Hershkowitz agreed to forfeit this property but was given the right to attempt to sell the property for a limited period of time. Approximately two weeks ago, Mr. Hershkowitz received an offer of $2.25 million for the apartment and made a counteroffer of $2.55 million, which was agreed by the buyer. The government is now handling the finalization of the sale of this property. The apartment was purchased in about 2004 for approximately $1,575,000.00 and significant renovations were undertaken.

The Trustee's Schedule alleges $1,764,546.97 in "payments to or on behalf of Michael Hershkowitz" in connection with the 85th Street property. Yet again, the Trustee's Schedule includes a portion of the purchase price and related fees ($663,136.78) (Trustee's Schedule at 1); partial investor payoffs following initial refinance ($94,200.00) (*id.* at 13) and interest payments to investors ($129,594.39) (*id.* at 15). These amounts total $886,931.17, reducing the alleged total of $1,764,546.97 to $877,615.80. Of this amount, the vast majority – $679,180.05 – was used, on the face of the document, to pay third parties in connection with the ownership and renovation of the condominium and related fees, including purchase of supplies, labor, architect and other professionals' fees, security deposits (ultimately returned to KGP but not reflected in the Trustee's Schedule), legal fees, banking and refinancing fees, and insurance. We have again endeavored to identify payments that are either personal in nature or unidentified to help the Court formulate a reasonable idea of the benefit actually received by Mr. Hershkowitz. In connection with the 85th Street property, payments that are unidentifiable due to a lack of information in the memo or payee section total $40,869.84 while payments that we have identified as personal to Mr. Hershkowitz total $9,147.61. *Id.* at 8-15. An additional $138,781.18 represents payments of mortgage, interest and tax, and $9,637.12 represents maintenance payments (*Id.* at 2, 15) which payments we accept as for the benefit of Michael Hershkowitz. Thus, the maximum amount that can be said to account for "payments to or for the benefit of Michael Hershkowitz" in connection with the 85th Street property is $198,435.75, not the $1,764,546.97 alleged in the Trustee's Schedule. *Id.* at 15.

2. *Expenses for 29 Pierpoint Place*

Michael Hershkowitz's mother, Sandra Hershkowitz, owns the property located at 29 Pierpoint Place, Staten Island, New York. During the relevant period, KGP completed a renovation of Mrs. Hershkowitz's kitchen at cost, which Mrs. Hershkowitz repaid to KGP. Thus, the $14,775.32 in expenses associated with this job are erroneously characterized as "payments" to or for the benefit of Mr. Hershkowitz and must be eliminated from that ultimate calculation.

3. *Health, Medical, Legal and Charitable Contributions*

6

**BRAFMAN & ASSOCIATES, P.C.**

Of the identified health-related expenditures, $2,867.15 represent health insurance premium payments for Mr. Hershkowitz and his family and, as such, represent a portion of Mr. Hershkowitz's compensation. The remainding $16,177.95 represents other payments for various health-related procedures for Mr. Hershkowitz and his family. Recognizing these payments to be personal, we accept the Trustee's analysis of this amount.

Of the identified legal fees, $1,500.00 represents fees incurred in connection with the Treescape property and therefore is not a payment to Mr. Hershkowitz or for his benefit. We accept the remaining $30,000.00 as personal to Mr. Hershkowitz.

Finally, we do not contest the $28,523.00 in charitable contributions. We therefore agree that $74,700.95 was paid to, or for the benefit of, Michael Hershkowitz from KGP in connection with health, medical, legal and charitable giving expenses.

    *4. Michael Hershkowitz Loan Account*

The Trustee's Schedule identifies $2,081,019.44 as payments to Michael Hershkowitz or for his benefit relating to "other personal expenses" and recorded to the Michael Hershkowitz Loan Account, prior to deductions of $172,224.96 for "proceeds from sale" of Bridle Path and $521,552.00 for "funds received into KGP through 150 East 85th Street refinancing. (Trustee's Schedule at 50). As discussed *supra,* payments relating to the Treescape property totaling $91,023.26 were included in this number, which should accordingly be reduced to $1,989,996.18. This amount also includes payments relating to the Bridle Path property. Specifically included are payments of mortgage, taxes and interest in the amount of $80,734.38 (Trustee's Schedule at 31-34) as well as fees relating to private garbage pickup and other ownership expenses in the amount of $989.03. *Id.* at 33-35. Thus the amount of alleged payments to Hershkowitz must be reduced by $81,723.41, to $1,908,272.77.

While the Trustee's Schedule allegedly represents payments to Michael Hershkowitz other than "purported compensation", the Michael Hershkowitz Loan Account portion of the Schedule includes $224,100.00 in direct compensation to Michael Hershkowitz. This further reduces the amount of alleged non-compensation payments to Michael Hershkowitz to $1,684,172.77.

Also included in the Michael Hershkowitz Loan Account portion of the Trustee's Schedule is $306,536.60 in loan repayments to Keren Hachesed of Monsey, Inc.[14], a 501(c)(3) organization that made an interest free loan of approximately $380,000.00 to KGP in connection with corporate expenses in approximately June 2000. This further reduces the alleged payment amount to $1,377,636.17. An additional $36,451.00 in payments to Keren Hachesed is

---

[14] The name of the organization is misspelled in the Trustee's Schedule as "Karen Hachesed of Monsey Inc."

7

**BRAFMAN & ASSOCIATES, P.C.**

improperly included in the Trustee's Schedule under "Transfer & Exchange". *See* Section 5, *infra*.

Having reviewed the remaining identified payments, we have identified as personal to Mr. Hershkowitz (including rent) payments of $537,170.92 together with maintenance and mortgage payments on the 85th Street property of $84,040.68 and $453,732.84, respectively. We have also identified an additional $278,802.01 in unidentifiable payments based on a lack of information in the payee or memo notation on the Trustee's Schedule; as in other categories, we are attributing these payments to Mr. Hershkowitz despite the fact that we do not believe the majority did, in fact, go to him or to his benefit. This results in maximum payments arguably to Mr. Hershkowitz or for his benefit in the amount of $1,353,746.45, which number must be reduced consistent with the Trustee's Schedule by the proceeds of the sale of Bridle Path ($172,224.96) and the refinancing of 85th Street ($521,552.00). Trustee's Schedule at 50. The maximum final amount attributable to Michael Hershkowitz or for his benefit under this analysis is $659,969.49.

5. *Transfer & Exchange*

The $36,451.00 identified in this category is for a loan repayment to Keren Hachesed of Monsey, Inc., and should not be attributed to Mr. Hershkowitz for the reasons discussed *supra* at Section 4.

Loss Amount

The government's submission appears to misunderstand the defendant's presentation of information relating to the offense conduct and the subsequent loss amount. In identifying the factors other than the defendant's fraud – for which he accepts full responsibility – which contributed to the diminishment of the value in the properties and the lack of return to the individual investors, the defendant seeks simply to apprise the Court of all of the relevant facts necessary in making its sentencing decision. 18 U.S.C. § 3553(a). So, for example, the defendant describes the proposed OZ joint venture <u>not</u> to "implicitly blame[] the victims for not following his urging to sell the buildings" (Gv't Sent. Mem. at 5) but rather to demonstrate that there was significant value in the portfolio of properties. Moreover, at no point does Mr. Hershkowitz argue that the OZ joint venture was a certainty, blocked only by the investors. As we wrote in the Sentencing Submission: "*While we cannot represent that the OZ joint venture would have ultimately closed*, we present the following information to demonstrate the real value that was in the properties owned and managed by KGP at the time the fraud was discovered." Def. Sent. Mem. at 29. (Emphasis added).

It is important for the Court to know that there was real, significant value in the properties prior to the arrest of Mr. Hershkowitz and his partner Ivy Woolf-Turk, particularly as the government, the Trustee and certain victims characterize the fraud as a "Ponzi scheme" and some even liken Mr. Hershkowitz to Bernard

8

## BRAFMAN & ASSOCIATES, P.C.

Madoff, who famously invested *none* of the monies invested with him as promised. Although Mr. Hershkowitz made false representations about the nature of the security the investors would receive – undoubtedly a serious crime – he did not steal the funds invested, or use the funds invested solely to make payments to earlier investors, as Mr. Madoff did, and as is essential to a Ponzi scheme. To the extent that certain interest payments were made from the monies borrowed from institutional investors, these interest payments were fully disclosed to the lenders as payments required to cover negative cash flow. Thus, it is inaccurate to state that the principal loan amounts were misused. *Compare* Gv't Sent. Mem. at 6. Interest payments to investors were also made from operational profits as well as from subsequent refinancing.

At no point does Michael Hershkowitz argue that the loss amount is zero, nor does he argue that "*much* of the loss . . . was caused by external market factors, rather than his fraud." *Compare* Gv't Sent. Mem. at 5. (Emphasis added). Instead, he identifies certain external factors[15] that reduced the amount of funds available to repay investors and argues that the loss amount of $27 million overstates the seriousness of his offense for guidelines purposes, given that he did not intend or reasonably foresee that his fraudulent conduct would cause the investors to lose all of the money invested. *See* Def.'s Sent. Mem. at 58-59.

### Victim Impact

While we understand that the victims who have written to the Court do not find solace in Mr. Hershkowitz's statements of remorse and regret for his conduct, those feelings are, in fact, real. In addition, accounts of Mr. Hershkowitz's care and concern for his family, his piety and his good deeds were not presented in an effort to negate or diminish his criminal conduct, but rather to offer the Court a complete picture of the man who will stand before your Honor to receive his sentence, in accordance with the mandate of 18 U.S.C. 3553(a). *See United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

The suggestion that Mr. Hershkowitz's charity and good works were made possible only as a result of his fraud is untrue. In fact, as recounted in the Sentencing Submission, many of Mr. Hershkowitz's significant good works were

---

[15] The government argues that the value of the properties lost to the costs of bankruptcy proceedings and the attendant decline in the real estate market were the "inevitable result of the defendant's criminal conduct." Gv't Sent. Mem. at 5. The defendant's criminal conduct cannot be said to have had any effect on the real estate market. While his criminal conduct can be said to have occasioned the bankruptcy, to the extent that there were excessive expenses associated with the bankruptcy, these cannot be blamed on the defendant's criminal conduct. *See, e.g.*, Letter dated January 20, 2010 from Katrina Dill to the Court.

**BRAFMAN & ASSOCIATES, P.C.**

the product of his time and effort rather than financial giving. *See* Def. Sent. Mem. at 6-18.

Finally, several victims who have written to the Court suggest that Mr. Hershkowitz is more culpable than Ms. Woolf-Turk and/or that he deserves a *harsher* sentence than Ms. Woolf-Turk. We find these statements objectionable for several reasons. First, the government, through its investigation, concluded that Mr. Hershkowitz and Ms. Woolf-Turk were equal partners in the KGP enterprise and in the fraud itself. Second, it is clear from Ms. Woolf-Turk's conduct during her proffers with the government and in her attempt to plant an important forged document in Mr. Hershkowitz's office, that Ms. Woolf-Turk's *modus operandi* has always been to paint Mr. Hershkowitz as the more culpable, dominant partner in their relationship. This is simply false and any claim otherwise should be rejected by this Court.[16] As this Court is well aware, maintaining sentencing parity between similarly situated defendants is an important goal of sentencing. As the Second Circuit has recognized, the "the plain language of 3553(a)(6) does not on its face restrict the kinds of disparity a court may consider." *United States v. Wills*, 476 F.3d 103, 109 (2nd Cir. 2007). Moreover, the Second Circuit has acknowledged that "[o]ne goal of the Sentencing Guidelines is to reduce unwarranted sentence disparities among federal defendants 'with similar records who have been found guilty of similar conduct.'" *United States v. Fearon-Hales*, 224 Fed.Appx. 109, 114 (2d Cir. 2007)[17]. Importantly, in this context, the Second Circuit has upheld sentencing disparities where, even among equally culpable co-defendants, one defendant has cooperated and the other has not. *See, e.g., Fearon-Hales*, 224 Fed.Appx. at 114 (finding that the disparate sentences of co-defendants not unwarranted when co-defendants pled guilty and cooperated with the government and the defendant did not); *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir.2006)

---

[16] In his letter to the Court, Frederic Rosen writes, "Anyone who did business with Kingsland and had direct involvement with the two perpetrators knows that Mr. Hershkowitz was the driving force in the organization. Ivy Woolf-Turk was a willing, aware and active participant but more of the blame for the crime must be placed on Michael hershkowitz's shoulders. As such his sentence should significantly exceed that of Ivy Woolf-Turk's sentence." Letter dated 1/20/10 from F. Rosen to the Court at 2. To the best of our knowledge, Mr. Hershkowitz never personally interacted with Mr. Rosen, and it is therefore unclear what his basis of knowledge is for these conclusory statements.

Similar statements by Budd Schwartz are likewise puzzling, since he spoke on an almost daily basis with Ms. Woolf-Turk throughout the course of the fraud, which required her to lie consistently and repeatedly to him. *Compare* Letter dated 1/19/10 from B. Schwartz to the Court at 1.

In contrast, the letter of Hon. Beerman is accurate with respect to the Beerman family's dealings with Mr. Hershkowitz and Ms. Woolf-Turk.

[17] In *Fearon-Hales*, the Second Circuit rejected the possibility of a downward departure to avoid sentencing disparity among co-conspirators. We do not ask for a departure on this basis, but rather a below-guidelines sentence consistent with – or below – that imposed on Ms. Woolf-Turk. Obviously, a downward departure based on Mr. Hershkowitz's cooperation is still warranted. U.S.S.G. § 5K1.1.

10

**BRAFMAN & ASSOCIATES, P.C.**

(explaining that different sentences among co-defendants were reasonable and readily apparent where co-defendants cooperated and defendant did not).

In this case, the Court is presented with two defendants charged with identical conduct, who are, by the government's own admission, <u>equally</u> culpable, and have the same criminal history.  While no two individuals can have identical personal histories or characteristics, we are not aware of any extraordinary personal circumstance that would urge a significantly lower sentence for Ms. Woolf-Turk.  In fact, the only major difference between these two co-defendants is the fact that Mr. Hershkowitz provided significant assistance to the government while Ms. Woolf-Turk lied to the government about each defendant's respective involvement in the criminal conduct.[18]  We believe that fairness dictates, and sound public policy requires, that Ms. Woolf-Turk's sentence of 60 months imprisonment represent the maximum sentence to be imposed by your Honor and, we would respectfully request that, after considering Mr. Hershkowitz's cooperation, your Honor impose a sentence below that imposed on Ms. Woolf-Turk.

We thank the Court for its courtesy in this and all other matters.

Very truly yours,

Benjamin Brafman

cc:   AUSA Harry Chernoff (via e-mail)

---

[18] Based on information provided by the government, the bankruptcy Trustee identified $640,185.74 in payments to or for the benefit of Ms. Woolf-Turk from January 1, 2001 through September 30, 2007.  As noted *supra*, Mr. Hershkowitz used his personal charge cards for business purchases ranging from appliances for all of the rental apartments to supplies in connection with all of the repairs and renovations.  Because it was impossible to ascertain which charges to his personal charge card were in fact for business purposes, we have been over inclusive and attributed  all of these payments to Mr. Hershkowitz, with the result that we have attributed a substantially higher amount of payments to him that should in fact be attributed to the business.  As such, we do not believe the amount of money actually received by each defendant to be materially different and, in any event, we do not believe that this amount provides a basis for a disparate sentence, given the significant similarities and Mr. Hershkowitz's cooperation.

11